United States District Court
Southern District of Texas
**ENTERED**
**February 07, 2023**
Nathan Ochsner, Clerk

# UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF TEXAS
### HOUSTON DIVISION

| | | |
|---|---|---|
| **LOUIS C. TALARICO, III,** | § | |
| | § | |
| **Plaintiff,** | § | |
| | § | |
| **v.** | § | **CIVIL ACTION NO. 4:21-CV-3689** |
| | § | |
| **C. BRADLEY JOHNSON, et al.,** | § | |
| | § | |
| **Defendants.** | § | |
| | § | |

## <u>MEMORANDUM AND RECOMMENDATION</u>

This is a *pro se* case brought in connection with the purchase of common stock in 2018, 2019, and 2020. (Dkt. No. 54 at 7.) Pending before the Court[1] are four Motions to Dismiss under Rule 12(b)(6) filed by six Defendants, all of whom are associated with the now bankrupt Ultra Petroleum ("Company").[2] (Dkt. Nos. 44, 46, 47, & 48.) Based on a thorough review of the motions, arguments, and relevant law, the Court **RECOMMENDS** the Motions to Dismiss be **GRANTED.**

---

[1] On April 7, 2022, this case was referred to the Undersigned for all purposes pursuant to 28 U.S.C. § 636(b)(1)(A) and (B) and Federal Rule of Civil Procedure 72. (Dkt. No. 53.)

[2] While the Complaint lists Ultra as a defendant in this proceeding, Ultra has not been served as it was dissolved in the 2020 Bankruptcy. Plaintiff makes arguments regarding whether Ultra Petroleum as an entity still exists and is a proper defendant here. (Dkt. No. 54 at 4-5.) Defendants Johnson and Stratton note that Plaintiff does not dispute that Ultra has not been served and is not properly before the Court as a party. (Dkt. No. 55 at 1.) Critically, Plaintiff does not cite support for his request that "this Court force Kirkland to accept service for Ultra." (Dkt. No. 54 at 5.) According to the Southern District, "Ultra no longer exists because it has been replaced by a 'reorganized and recapitalized entity.'" *Talarico v. Ultra Petroleum Corp.*, No. 20-32631, 2020 WL 8361996, at *1 (S.D. Tex. Dec. 29, 2020), *aff'd sub nom. Matter of Ultra Petroleum Corp.*, No. 21-20049, 2022 WL 989389 (5th Cir. Apr. 1, 2022). Accordingly, the Court finds this request MOOT and it is DENIED.

## I.    BACKGROUND

Plaintiff Louis C. Talarico, III ("Plaintiff") filed this action on November 10, 2021, and a First Amended Complaint on March 7, 2022, alleging that Defendants C. Bradley Johnson, Jerald J. Stratton, Evan Lederman, Fir Tree Capital Management LP, Centerview Partners LLC., and Karn Chopra (collectively "Defendants") engaged in seven categories of misconduct amounting to securities fraud under §§ 10(b) and 20(a) of the Securities Exchange Act of 1934, Rule 10b-5 implementing § 10(b) of the Act, Texas common law fraud, breach of fiduciary duty, and knowing participation of a breach of fiduciary duty. 15 U.S.C. § 78j(b); 17 C.F.R. § 240.10b-5. (Dkt. Nos. 1, 43.)

Plaintiff generally alleges Defendants made omissions of material fact; caused the Company to make misleading guidance in press releases, investor presentations, and earnings calls; intentionally misled Plaintiff with selective production reporting; intentionally misled Plaintiff about well cost information regarding the horizontal wells; misled Plaintiff about the nature of the oil content in the horizontal drilling program; misled Plaintiff regarding the assets located in the Pinedale Anticline in Wyoming, specifically in the Pinedale and Jonah fields ("Undeveloped Inventory"); and failed to disclose the event of default leading to the Company's 2020 bankruptcy. (Dkt. No. 54 at 8–9.) Plaintiff contends Defendants deceived him regarding the value of the Company's assets, the profitability of those assets, and the Company's financial controls. Plaintiff alleges he was accordingly harmed when he purchased Company stock at artificially inflated prices and held securities beyond the time it was financially prudent. (Dkt. No. 43 at ¶ 186.)

Plaintiff is a registered securities professional with over twenty years of experience. (Dkt. No. 43 at ¶ 11.) After the Company emerged from bankruptcy in 2016, Plaintiff learned about the

Company's plan to expand into horizontal drilling in 2017. (Dkt. No. 43 at ¶ 75.) Plaintiff reviewed the Company's historical public filings, investor presentations, earnings call transcripts, and performance records of other wells in the area the Company planned to drill. (*Id.* at ¶ 75.) Plaintiff also sought industry advice as initial research before investing in the Company. (*Id.* at ¶ 76.)

The Company, who principally pursued vertical drilling, disclosed it would attempt to expand its existing assets through horizontal drilling at the end of 2017. (Dkt. No. 44 at 2.) The Company drilled three test wells and disclosed the initial production rates between November 2017 and January 2018 (Warbonnet 9-23 A-1H,[3] Warbonnet 9-23 M-lH,[4] and Warbonnet 9-23 A-2H[5]). (*Id.* at 2–3.) The Company released information on the Warbonnet 9-23 A-1H well November 7, 2017, where the Company warned they were "not providing 2018 guidance at" the time of the release as they continued to review the well's results. (Dkt. No. 44 at 2–3.) The Company subsequently disclosed information on January 30, 2018, regarding the other two test wells, indicating due to "recent success of the horizontal well program, the Company" would adjust "development plans for 2018 to include more horizontal wells." (*Id.* at 3.)

On or about February 28, 2018, Plaintiff reviewed the Company's Form 10-K, its recently issued press release, accompanying investor presentation, publicly available earnings transcripts, and discussed the information with an experienced industry individual. (Dkt. No. 43 at ¶ 76.) Plaintiff made his first investment on March 2, 2018 and executed a series of investments through March 8, 2018. (*Id.* at ¶ 77.)

On March 12, 2018, the Company issued a press release which provided an update on one of the horizontally drilled wells, the Second Monster Well. (*Id.* at ¶ 78.) Plaintiff executed a series

---

[3] Referred to by Plaintiff as the First Monster Well.
[4] Referred to as the Mesaverde Well.
[5] Referred to by Plaintiff as the Second Monster Well.

of investments from March 12, 2018, through April 10, 2018 because of the March 12, 2018, press release, "Defendants'" representations about the horizontal and vertical programs, and the Company's asset base and financial condition. (*Id.*)

On April 19, 2018, the Company issued another press release where Defendant Johnson touted his confidence in the Company's assets, business plan, and guidance. (*Id.* at ¶ 79.) Plaintiff executed another series of investments from April 19, 2018, through April 23, 2018, because of the April 19, 2018, press release and "Defendants" representations about the Company's asset base and financial condition. (*Id.*) During this period Plaintiff executed certain long-dated option transactions called puts and calls.[6] (*Id.* at ¶ 80.) Plaintiff's last open market purchase of the Company's securities was April 23, 2018.[7]

Plaintiff's investments in the Company included buying common stock, buying call options, and selling put options between March 2, 2018, and April 23, 2018. (*Id.* at ¶ 77.) The put options obligated Plaintiff to purchase common stock at a set price if the put was exercised against

---

[6] "A put option gives the buyer the right, but not the obligation, to sell an asset at a specified price (the strike price) before the option's expiration date. A call option gives the buyer the right, but not the obligation, to buy an asset at a specified price (the strike price) prior to its expiration date. . . . Buyers of put options profit on the difference between the strike price minus the premium the buyer must pay to buy the option and the lower price of the asset. The maximum loss is the premium paid to buy it. Buyers of call options make money on the difference between the strike price plus the premium paid and however much the price of the asset has increased. The maximum loss is the premium paid to buy it." https://www.chase.com/personal/investments/learning-and-insights/article/whatareputsandcalls#:~:text=A%20put%20option%20gives%20the,prior%20to% 20its%20expiration%20date (explaining puts and calls are instruments investors use in their investment strategy to manage risk).

[7] Plaintiff notes, for the first time, a May 2020 purchase of Ultra common stock on the open market. (Dkt. No. 54 at 11 n.16.) Plaintiff acknowledges is likely not essential to the legal analysis, but if required he will amend the complaint to add this fact. (*Id.*) Plaintiff cannot amend his complaint through his brief. *Cont'l Auto. Sys. v. Avanci*, 27 F.4th 326, 333 (5th Cir. 2022) ("a complaint cannot be amended by briefs in opposition to a motion to dismiss"). Plaintiff's right and the Court's recommendation for granting leave to amend will be discussed *Infra* sec. VII.

him. (*Id.* at ¶ 80.) The call options gave Plaintiff the right to buy common stock at a set price if he chose to exercise the option. (*Id.*) As a result of the put option being exercised against Plaintiff, he was obligated to buy additional common stock in December 2018, January, March, May, August, and December 2019, and January 2020 at the price agreed to on or before April 23, 2018. (*Id.*; Dkt. No. 44 at 4.) Plaintiff retained his Company securities at allegedly inflated market prices through the decline of natural gas prices and was contractually obligated to purchase additional shares despite the unforeseen market downturn of the COVID-19 pandemic. (Dkt. No. 43 at ¶ 12.)

"In August 2018, after only one full quarter of horizontal drilling, [the Company] disclosed that 'the average performance of these [horizontal] wells in the second quarter was below expectations' and that it was 'scaling back the horizontal effort.'" (Dkt. No. 44 at 3.) The Company suspended the horizontal program in November 2018, disclosed it would not drill any horizontal wells in March 2019, and suspended the vertical program in September 2019. (*Id.* at 3–5.) The Company put the program on hold in light of declining natural gas prices beginning in November 2018 which continued to decline to historic lows for a year and a half through the COVID-19 pandemic. (*Id.* at 5.) The Company filed its Chapter 11 petition for bankruptcy in May 2020, which was eventually approved by the bankruptcy court. (*Id.*) As a result of the 2020 bankruptcy, Plaintiff's common stock in the Company was cancelled. (Dkt. No. 43 at ¶¶ 78–84.)

Plaintiff, citing his "duty as a gatekeeper to the securities industry," proceeded *pro se* in the bankruptcy suit in an attempt to block the Company's proposed bankruptcy plan. (*Id.*) Plaintiff argued the plan undervalued the Company's assets, despite now contending Defendants committed fraud to artificially inflate stock. (*Id.*) Plaintiff conducted extensive cross examination of several of the Defendants whose answers— he now asserts— confirm fraudulent activity. (*Id.*) Despite Plaintiff's questioning and the proof he claims he elicited, the bankruptcy court overruled several

objections Plaintiff urged during the proceeding and denied his motion to appoint an official equity committee. *See In re Ultra Petroleum Corp.*, No. 20-32631 (Bankr. S.D. Tex.); *Talarico*, 2020 WL 8361996, at *2.

The court found that shareholders, such as Plaintiff, were out of money by clear and convincing evidence and ultimately approved the Plan. *Id.* The bankruptcy court denied Plaintiff's motion for judgment. *Id.* Plaintiff then appealed to the district court who affirmed the bankruptcy court's ruling confirming the bankruptcy plan. *See generally id.* at *2–3 (noting that the evidence is lacking on its face regarding Plaintiff's allegations of fraud and deceit, but the allegation is not a matter that can be litigated in the Chapter 11 proceeding because it relates to the conduct of officers not Ultra as an entity). Plaintiff appealed to the Fifth Circuit who also affirmed the plan. *Matter of Ultra Petroleum Corp.*, 2022 WL 989389 (5th Cir. Apr. 1, 2022).

Plaintiff now alleges the Company's common stock was artificially inflated, as opposed to his argument in the bankruptcy proceeding that the Company's stock was fraudulently undervalued. (Dkt. No. 43 at ¶¶ 1–3.) Plaintiff argues that all Defendants made or caused the Company to make a series of materially false, misleading statements and/or omissions about the Company's horizontal drilling program, vertical drilling program,[8] and Undeveloped Inventory which overstated the value of its assets, and made further misrepresentations and omissions leading up to and throughout the 2020 bankruptcy. (*Id.* at ¶ 34.) Plaintiff emphasizes that while the bankruptcy plan was confirmed, the court "never reached a conclusion as to whether the contradictory statements by the Defendants about the Undeveloped Inventory were fraudulent."

---

[8] As indicated in the bankruptcy proceeding, the vertical program was not economic as of November 7, 2019. (Dkt. No. 43 at ¶ 136.) As the Court explains *infra* in Section III. A. a., the Court does not consider any statements or omissions beyond Plaintiff's last open market purchase, April 23, 2018.

(*Id.* at 21.) Plaintiff now brings claims under §§ 10(b) and 20(a) of the Securities Exchange Act, Rule 10-b5, Texas common law fraud, breach of fiduciary duty, and knowing participation/aiding and abetting a breach of fiduciary duty. (Dkt. No. 43.)

On March 18, 2022, Defendants filed four Rule 12(b)(6) Motions to Dismiss representing six Defendants. (Dkt. Nos. 44, 46, 47, 48.) Defendants argue Plaintiff fails to state a claim because he does not state a §10(b) claim; he does not plead a primary violation of the Exchange Act as required under § 20(a); he does not plead a valid state claim for common law fraud; and his fiduciary duty claim fails because corporate officers do not owe fiduciary duties to individual shareholders. (Dkt. No. 44 at 2; Dkt. No. 46 at 2; Dkt. No. 47 at 2; Dkt. No. 48 at 2.) Defendant Centerview also argues claim and issue preclusion estop Plaintiff from proceeding against it due to the bankruptcy proceedings. (Dkt. No. 48 at 3.) In response, Plaintiff primarily repeats the facts alleged in his amended complaint—that Defendants made false and misleading statements and/or omissions of material fact—and asserts that Defendants misrepresent the law and facts, and accordingly the motions to dismiss are frivolous and a means of harassing Plaintiff.[9] (Dkt. No. 54 at 7.) After a thorough and holistic review of this case, the Court finds Plaintiff has failed to state a claim against any Defendant, and the case should be dismissed.

## II.    LEGAL STANDARDS

A complaint in a federal securities fraud claim must contain "a short and plain statement of the claim showing that the pleader is entitled to relief" but must also meet additional heightened pleading requirements under Rule 9(b). Fed. R. Civ. P. 8(a)(2).

### A.  Rule 9(b)

---

[9] Plaintiff seemingly requests the Court sanction Defense counsel for filing their 12(b)(6) motions. (*See* Dkt. No. 54 at n.13.) This request is without merit, and is DENIED.

Rule 9(b) is interpreted strictly and requires the plaintiff to "specify the statements contended to be fraudulent, identify the speaker, state when and where the statements were made, and explain why the statements were fraudulent." *Flaherty & Crumrine Preferred Income Fund, Inc. v. TXU Corp.*, 565 F.3d 200, 207 (5th Cir. 2009) (citations omitted); Fed. R. Civ. P. 9(b). The Private Securities Litigation Reform Act ("PSLRA") further requires plaintiffs to specify each statement alleged to have been misleading, the reason or reasons why the statement is misleading, and for "each act or omission alleged" to be false or misleading, "state with particularity facts giving rise to a strong inference that the defendant acted with the required state of mind." *Indiana Elec. Workers' Pension Tr. Fund IBEW v. Shaw Grp., Inc.*, 537 F.3d 527, 533 (5th Cir. 2008) (citing 15 U.S.C. § 78u-4(b)(1)-(2) & (b)(2)(A).

## B.  §§ 10(b) and 20(a) of the Securities Exchange Act of 1934 and Rule 10b-5

Section 10(b) of the Securities Exchange Act of 1934, and Securities and Exchange Commission (SEC) Rule 10b-5 provide an implied private right of action based on material misstatements or omissions in connection with the sale or purchase of a security. 15 U.S.C. § 78j(b); 17 C.F.R. § 240.10b-5. Section 10(b) is the general antifraud provision of the Act and states:

> It shall be unlawful for any person, directly or indirectly, by the use of any means or instrumentality of interstate commerce or of the mails, or of any facility of any national securities exchange—
> . . . . .
> (b) To use or employ, in connection with the purchase or sale of any security registered on a national securities exchange or any security not so registered, any manipulative or deceptive device or contrivance in contravention of such rules and regulations as the [SEC] may prescribe.

15 U.S.C. § 78j. Rule 10b–5, adopted by the SEC in 1942, implements § 10(b) and makes it unlawful for any person, directly or indirectly:

> (a) To employ any device, scheme, or artifice to defraud,

(b) To make any untrue statement of a material fact or to omit to state a material fact necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading, or

(c) To engage in any act, practice, or course of business which operates or would operate as a fraud or deceit upon any person, in connection with the purchase or sale of any security.

17 C.F.R. § 240.10b-5.

Section 20(a) of the Exchange Act asserts liability for control-person liability. 15 U.S.C. § 78t(a). It creates liability for anyone "who, directly or indirectly, controls any person liable [for Exchange Act violations] shall also be liable . . . to the same extent as such controlled person". A plaintiff must establish a primary violation before the defendant can be found liable under § 20(a) and courts may only hold control persons liable jointly and severally with the primary violators for damages the primary violation caused. *Southland Sec. Corp. v. INSpire Ins. Sol., Inc.*, 365 F.3d 353, 383 (5th Cir. 2004). Defendants, likewise, cannot be grouped together in a control person claim. *Id.* A control person is not liable if they acted in good faith and did not directly or indirectly induce the act or acts constituting the violation. 15 U.S.C. § 78t(a).

A complaint asserting a securities fraud claim under these provisions must affirmatively plead and prove that the plaintiff has standing. A plaintiff has standing under the Act as an actual purchaser or seller of securities; however, a plaintiff does not have standing as a mere holder of securities. *Blue Chips Stamp v. Manor Drug Stores*, 421 U.S. 723, 730–31 (1975); *see also Birnbaum v. Newport Steel Corp.*, 193 F.2d 461 (2d Cir. 1952) (finding that a purchase or sale was required for a Rule 10b–5 cause of action). A potential buyer who was dissuaded from purchasing as a result of a fraudulent misstatement, or an investor who held a security and, in reliance on the alleged misstatement, did not sell it, cannot bring suit. *See Merrill Lynch, Pierce, Fenner & Smith Inc. v. Dabit*, 547 U.S. 71, 79–80 (2006). "It is well established that mere retention of securities in reliance on material misrepresentations or omissions does not form the basis for a § 10(b) or Rule

10b–5 claim." *Krim v. BancTexas Grp., Inc.*, 989 F.2d 1435, 1443 (5th Cir. 1993) (citing generally *Blue Chip Stamps*, 421 U.S. at 723).

A plaintiff who has established standing as a purchaser or seller must show "(1) a misstatement or omission (2) of a material fact (3) made with scienter (4) on which the plaintiff relied (5) that proximately caused his injury." *Abrams v. Baker Hughes Inc.*, 292 F.3d 424, 430 (5th Cir. 2002) (quoting *Shushany v. Allwaste, Inc.*, 992 F.2d 517, 520–21 (5th Cir.1993)). The maker of the fraudulent statement is the entity with the authority over the content of the statement and whether and how to communicate the statement. *Janus Cap. Grp. v. First Derivative Traders*, 564 U.S. 135, 144–46 (2011). A defendant does not make a statement by simply preparing it or publishing in on behalf of another. *Id.* at 146, 148. Yet, "dissemination of false or misleading statements with intent to defraud can fall within the scope of subsections (a) and (c) of Rule 10b–5, . . . that is so even if the disseminator did not "make" the statements and consequently falls outside subsection (b) of the Rule." *Lorenzo v. Sec. & Exch. Comm'n*, 139 S. Ct. 1094, 1100–01 (2019) (finding a director of investment banking, who did not make statements under *Janus*, liable under the rule for scheme liability for sending emails he understood to contain material misstatements because he had the intent to defraud which was already determined by the lower court and uncontested).

Scienter is defined as the mental state embracing "an intent to deceive, manipulate, or defraud or that severe recklessness in which the danger of misleading buyers or sellers is either known to the defendant or is so obvious that the defendant must have been aware of it." *Flaherty*, 565 F.3d at 207 (quoting *R2 Invs. LDC v. Phillips*, 401 F.3d 638, 641 (5th Cir. 2005)). Severe recklessness is:

> limited to those highly unreasonable omissions or misrepresentations that involve not merely simple or even inexcusable negligence, but an extreme departure from

> the standards of ordinary care, and that present a danger of misleading buyers or sellers which is either known to the defendant or is so obvious that the defendant must have been aware of it.

*Natheson v. Zonagen Inc.*, 267 F.3d 400, 408 (5th Cir.2001) (applying the PSLRA standard which requires that factual allegations are pleaded with particularity which support a strong inference of scienter); *Tellabs, Inc. v. Makor Issues & Rts., Ltd.*, 551 U.S. 308, 319 (2007).

A three-step approach is required to analyze a strong inference of scienter at the motion to dismiss stage. *Indiana Elec.*, 537 F.3d at 533. First, all factual allegations must be taken as true. *Tellabs*, 551 U.S. at 322. "Second, courts may consider documents incorporated in the complaint by reference and matters subject to judicial notice." *Indiana Elec.*, 537 F.3d at 533. Courts must consider all plausible explanations for the claimed conduct and consider whether all the facts alleged, taken collectively, give rise to a strong inference of scienter, not whether individual allegations viewed in isolation meets the standard. *Tellabs*, 551 U.S at 323; *Abrams*, 292 F.3d at 431. Third, the strong inference of scienter must be "cogent" and at least as compelling as an opposing inference drawn from the facts alleged, not just reasonable or permissible. *Flaherty*, 565 F. 3d at 208. "Allegations of motive and opportunity, standing alone, are no longer sufficient to plead a strong inference of scienter, although appropriate allegations of motive and opportunity may enhance other allegations of scienter." *Abrams*, 292 F.3d at 430 (quoting *Nathenson*, 267 F.3d at 410–12).

"[O]missions and ambiguities count against inferring scienter, for plaintiffs must 'state with particularity facts giving rise to a strong inference that the defendant acted with the required state of mind.'" *Tellabs*, 551 U.S. at 325. Disclosure is required "only when necessary to make . . . statements made, in the light of the circumstances under which they were made, not misleading."

*Matrixx Initiatives v. Siracusano*, 563 U.S. 27, 44 (2011) (internal quotations omitted). For that reason, "[a] claim of incomplete disclosure is actionable only if what they said is misleading. In other words it must affirmatively create an impression of a state of affairs that differs in a material way from the one that actually exists." *Indiana Elec. Workers'*, 537 F.3d at 541–42 (internal quotations omitted). An omission is material if there is a "substantial likelihood that the disclosure of omitted fact would have been viewed by the reasonable investor as having significantly altered the 'total mix' of information available." *In re Enron Corp. Sec., Derivative & "ERISA" Litig.*, 238 F. Supp. 3d 799, 818 (S.D. Tex. 2017), *aff'd sub nom. Lampkin v. UBS Fin. Servs., Inc.*, 925 F.3d 727 (5th Cir. 2019) (holding investors' claim that financial services provider's wholly-owned subsidiaries wrongfully induced them to continue holding stock in provider's corporate client by misleading them as to strength of client's financial position was not cognizable under § 10(b) and Rule 10b-5).

The Fifth Circuit does not permit group pleading for scienter because it fails to meet the required heightened pleading standard. *Owens v. Jastrow*, 789 F.3d 529, 537 (5th Cir. 2015). Courts are required to look at the corporate official(s) state of mind "who make or issue the statement (or order or approve it or its making or issuance, or who furnish information or language for inclusion therein, or the like) rather than generally to the collective knowledge of all the corporation's officers and employees acquired in the course of their employment." *Indiana Elec. Workers'*, 537 F.3d at 533 (quoting *Southland*, 365 F.3d at 366). Thus, for a court to determine if the complaint sufficiently pleads scienter it must only address the allegations that adequately show scienter on the part of the officers. *Southland*, 365 F.3d at 367.

Rule 10b–5's private right of action does not include suits against aiders and abettors. *Cent. Bank of Denver, N.A. v. First Interstate Bank of Denver, N.A.*, 511 U.S. 164, 180 (1994). Such

suits—against entities that contribute "substantial assistance" to the making of a statement but do not actually make it—may be brought by the SEC but not by private parties. *Janus*, 564 U.S. at 143.

### C. Rule 12(b)(6)

Rule 12(b)(6) allows a defendant to move to dismiss a complaint based on failure to state a claim upon which relief can be granted. Fed. R. Civ. P. 12(b)(6). To survive such a motion, "a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id.* A complaint "must provide the plaintiff's grounds for entitlement to relief—including factual allegations that . . . raise a right to relief above the speculative level." *Wilson v. Houston Cmty. Coll. Sys.*, 955 F.3d 490, 500 (5th Cir. 2020) (quotations omitted).

In reviewing a 12(b)(6) motion, a court must accept "all well-pleaded facts as true and view[] those facts in the light most favorable to the plaintiff." *True v. Robles*, 571 F.3d 412, 417 (5th Cir. 2009) (quotations omitted). However, a court is not bound to accept legal conclusions couched as factual allegations. *Papasan v. Allain*, 478 U.S. 265, 286 (1986); *see Iqbal*, 556 U.S. at 678 ("[T]he tenet that a court must accept as true all of the allegations contained in a complaint is inapplicable to legal conclusions. Threadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice."). "Generally, a court ruling on a 12(b)(6) motion may rely on the complaint, its proper attachments, 'documents incorporated into the complaint by reference, and matters of which a court may take judicial notice.'" *Wolcott v. Sebelius*, 635 F.3d 757, 763 (5th Cir. 2011) (quoting *Dorsey v. Portfolio Equities, Inc.*, 540 F.3d

333, 338 (5th Cir. 2008)). In a securities fraud claim, "[i]f the plaintiff fails to satisfy the pleading requirements for scienter, the district court shall, on defendant's motion to dismiss, dismiss the complaint." *In re Enron Corp.*, 238 F. Supp. 3d at 826 (citations and internal quotations omitted).

## III.   DISCUSSION

The Court will address the allegations that, according to Plaintiff, lead to a strong inference of scienter as they correspond with his last open market purchase of securities. Plaintiff alleges broad categories of conduct, and the Court will proceed defendant by defendant, addressing allegations unique to the defendant, to comprehensively determine if Plaintiff has alleged facts that give rise to a strong inference of scienter as to any defendant. *See Owens*, 789 F.3d at 537 (citing *Central Laborers' Pension Fund v. Integrated Elec. Servs. Inc.,* 497 F.3d 546, 552–55 (5th Cir.2007) (employing two-step method)). The First Amended Complaint contains limited allegations of direct fraudulent conduct; Plaintiff's claims largely sound in circumstantial allegations. *See Shaw*, 537 F.3d at 535.

### A.   PLAINTIFF'S FIRST AMENDED COMPLAINT FAILS TO STATE A CLAIM AGAINST ANY OF THE DEFENDANTS FOR VIOLATIONS UNDER § 10(b), RULE 10(b)-5, and § 20(a) OF THE SECURITIES EXCHANGE ACT.

Plaintiff alleges Defendants' conduct was intended to and did deceive Plaintiff to purchase securities at artificially inflated prices and hold the securities when it was no longer prudent. (Dkt. No. 43 at ¶¶ 177, 182.) Plaintiff asserts he would not have held onto his securities if he were aware of the alleged misrepresentations and/or omissions. (*Id.* at ¶ 186.)

#### a.   All Defendants argue that any statement and/or omission that occurred after April 23, 2018, Plaintiff's final open market purchase of stock, is barred by the holder doctrine, and thus cannot support a § 10b or Rule 10b-5 claim.

Plaintiff has standing to bring a private action if the "complaint . . . allege[s] facts which could support a finding that any alleged wrongdoing has been in connection with the purchase or

sale of securities." *Rathborne v. Rathborne*, 683 F.2d 914, 917–18 (5th Cir. 1982). "The relevant definitional section of the 1934 Act [is] for the most part unhelpful; [it] only declare[s] generally that the terms 'purchase' and 'sale' shall include contracts to purchase or sell." *SEC v. Natl. Sec., Inc.*, 393 U.S. 453, 466 (1969).[10] After a purchase or sale has been made, an investor who retains their investments, is a holder of those securities. 3 Law Sec. Reg. § 12:45. The Purchaser/Seller Standing Requirement—Would-be Purchasers and Sellers; Deferred Sellers. A holder of securities, as opposed to a purchaser or seller of securities, does not have standing to sue for securities fraud. 17 C.F.R. § 240.10b–5; 15 U.S.C.A. § 78j(b). "[T]here is no 'holder' claim under federal securities law." *Amorosa v. AOL Time Warner Inc.*, 409 F. App'x 412, 417 (2d Cir. 2011) (summary order) (citing *Druck Corp. v. Macro Fund Ltd.*, 290 Fed. App'x 441, 445 (2d Cir. 2008) (summary order) (affirming dismissal of 10b–5 claim on ground that plaintiff, as a mere "holder" of securities, lacked standing)).

No party disputes that under *Blue Chip Stamps*, the Supreme Court rejected holder claims for common stock under § 10(b) or Rule 10b-5. 421 U.S. at 734–35. A holder claim occurs when a plaintiff alleges the defendant induced them to continue holding the common stock in reliance on material misrepresentations or omissions. *See Krim*, 989 F.2d at 1443 & n.7 (commenting "mere retention" does not form the basis of a federal securities fraud claim); *see also Grant Thornton LLP v. Prospect High Income Fund*, 314 S.W.3d 913, 926 (Tex. 2010) ("The U.S. Supreme Court has refused to recognize holder claims under federal securities law, primarily due to their speculative nature and difficulties in proof.").

---

[10] Purchase and buy includes any contract to buy, purchase, or acquire security. 15 U.S.C. § 78c (a)(13). Sell and sale includes any contract to sell or otherwise dispose of a security. 15 U.S.C. § 78c (a)(14).

The dispute here then is if Plaintiff's option contracts and stock acquisition after April 23, 2018, qualify him as a seller/purchaser to confer standing for a § 10(b) or Rule 10b-5 claim. This is critical to Plaintiff's claim because "even if [he] can . . . establish[] that there has been wrongdoing 'in connection with the purchase or sale of a security,' a private party does not have standing to recover under Rule 10b-5 unless the plaintiff can allege and ultimately establish that he himself was a purchaser or seller." *Rathborne*, 683 F.2d at 918.

Plaintiff argues that holding put and call option contracts qualifies him as a purchaser/seller after April 23, 2018, and the holder claim doctrine does not apply to those contracts which resulted in purchasing additional securities. (Dkt. No. 54 at 11–14.) Plaintiff's securities positions included buying call options and selling put options between April 19, 2018, through April 23, 2018. (Dkt. No. 43 at ¶¶ 1, 77.) Plaintiff purchased long date call options that were held until January 17, 2020, which represented Plaintiff's right to purchase common stock at a set price. (*Id.*) Plaintiff sold a contractual put option to open a long position. (*Id.* at 36 n.41.) The put option contract obligated Plaintiff to purchase common stock at a set price if it was exercised against him. (*Id.* at ¶ 80.) As a result, the contract obligated Plaintiff to buy additional common stock in December 2018, January, March, May, August, and December 2019, and January 2020 because the contractual option holder exercised its option against Plaintiff at the price agreed to before April 23, 2018. (*Id.*; Dkt. No. 44 at 4.) Plaintiff held a right to acquire common stock but he does not allege he exercised his option to acquire the stock. (Dkt. No. 43 at ¶ 80.)

"The Birnbaum rule . . . permits exclusion prior to trial of those plaintiffs who were not themselves purchasers or sellers of the stock in question. . . . [F]ailure to qualify under the Birnbaum rule is a matter that can normally be established by the defendant . . . on a motion to dismiss." *Blue Chip Stamps*, 421 U.S. at 742. There are three types of potential plaintiffs which

are barred under this rule: first, potential purchasers of shares who allege they did not purchase because of an "unduly gloomy representation or omission" making the investment seem less favorable than it actually was; second, current shareholders of the stock "who allege that they decided not to sell their shares because of an unduly rosy representation or failure to disclose unfavorable" information; and third, shareholders "who suffered a loss in the value of their investment due to corporate or insider activities in connection with the purchase or sale of securities." *Id.* at 737–38. Plaintiff's allegations past April 23, 2018, fall between the second and third category of impermissible plaintiffs.

Here, Plaintiff was a holder of both puts and calls. (Dkt. No. 43 at ¶ 1, 79.) The sale of put options and purchase of call options constitutes selling and purchasing a contractual right. Plaintiff bought a contract right and sold a contract right as a part of his investment strategy.[11] Plaintiff's deliberate transactions qualify him as a buyer and seller for those contractual rights, however, once the transaction was completed, he became a holder of stock options. *In re Enron Corp. Securities Litigation*, 238 F. Supp. 3d 799, 835 (S.D. Tex. 2017) (explaining holders of stock options did not have standing). The contracts contained pre-determined price provisions. The transactions past April 23, 2018 were governed by the price in the contract. The purchase price could not be "induced by the fraud" of any statement or omission that occurred after the date the price was agreed to between the parties. *Chadbourne & Parke LLP v. Troice*, 571 U.S. 377, 389 (2014).

So, while "the holders of puts, calls, options, and other contractual rights or duties to purchase or sell securities have been recognized as 'purchasers' or 'sellers' of securities for purposes of Rule 10b-5" the right must be limited to the purchase or sale of the contractual right

---

[11]     https://corporatefinanceinstitute.com/resources/derivatives/options-calls-and-puts/ (explaining the purpose and application of calls and puts).

because it is only that original transaction that can be affected by any alleged wrongdoing "in connection with the purchase or sale of securities" rather than those transactions which come about in connection with someone else exercising a contractual right. *Rathborne*, 683 F.2d at 917–18; *Blue Chip Stamps*, 421 U.S. at 751 (discussing definition provisions adopted under 3(a) of the 1934 Act, 15 U.S.C. § 78c(a)).

The option contract dictated a purchase of common stock past April 23, 2018, which was exercised against Plaintiff. Plaintiff did not make any investment decisions related to the puts after April 23, 2018, when the contract was entered into, so it cannot be connected to any fraudulent misrepresentation and/or omission past that date. Thus, the Court will not consider any put options exercised past April 23, 2018, because Plaintiff's purchases made as a contractual obligation were not induced by Defendant's alleged misrepresentations or omissions. Those purchases were not made in connection with an alleged misrepresentation or omission. They were made in connection with Plaintiff's right he sold, which then obligated him to purchase additional securities at someone else's behest.

Plaintiff still maintains that holding the contractual right to exercise the call option entitles him to standing. *Aiello v. Brown*, No. 19 CIV. 9647 (AT), 2021 WL 1225445, at *4 (S.D.N.Y. Mar. 31, 2021), *aff'd*, No. 21-0987-CV, 2021 WL 5505107 (2d Cir. Nov. 24, 2021) (holding plaintiffs, as holders of rights to purchase securities, who did not exercise their right, did not demonstrate statutory standing). Plaintiff does not allege he exercised his call options in reliance of an alleged misstatement or omission; he merely alleges that holding the call option defeats Defendants' application of the holder doctrine because he could have exercised it until January 2020. (Dkt. No. 54 at 11–13.) In support, Plaintiff recites the *Blue Chip* dicta discussing the definitional provisions of the Act as persuasive, but he fails to square the dicta with *Birnbaum*. It

would defeat the purpose of the Birnbaum Rule to use the call option Plaintiff held as a basis for his § 10(b) and Rule 10b-5 claim. The Rule does not allow for Plaintiff to recover for "largely conjectural and speculative recovery in which the number of shares involved will depend on . . . [P]laintiff's subjective hypothesis" in relation to merely holding his call options. *Blue Chip Stamps*, 421 U.S. at 735.

*Birnbaum* and *Blue Chip* disqualify plaintiffs who allege they were current shareholders who decided to hold on to stock because of an "unduly rosy representation or failure to disclose unfavorable" information and those "who suffered a loss in the value of their investment due to corporate . . . activities in connection with the purchase or sale of securities." *Id*. at 737–38. This logically extends to holding stock options. *McKissick v. Gemstar-TV Guide Int'l, Inc.*, 415 F. Supp. 2d 1240, 1244 (N.D. Okla. 2005) (applying the Birnbaum rule and denying standing to a plaintiff who did not allege she purchased or sold stock but that she had the contractual right to purchase or sell stock that was not exercised due to alleged misrepresentations and/or omissions by the defendants).

Plaintiff contends the conduct after April 23, 2018, comprises the vast majority of the allegations brought under § 10b and Rule 10-b5. (Dkt. No. 54 at 14.) Plaintiff alleges because Defendants do not present any argument against the conduct, all fraudulent allegations are conceded for the purposes of the motion to dismiss. (*Id.*) This assertion ignores the prevailing application of the law under *Birnbaum* and *Blue Chip* which instructs that between holding a right and exercising the right, only one may lead to standing.

The Court finds Plaintiff fails to prove he has standing beyond April 23, 2018, because merely holding an option, without more, does not suffice for a § 10(b) or Rule 10b-5 claim. *See McKissick*, 415 F. Supp. 2d at 1245 ("To allow the Plaintiff, who simply held [stock options], to

qualify as a *purchaser* or seller of stock under Rule 10b–5 under these facts would destroy the Supreme Court's reasoning for adopting the Birnbaum Rule."). Thus, the Court will not consider any alleged misstatement or omission made after April 23, 2018 for Plaintiff's federal claims, because he did not make any additional investment decisions beyond holding his contractual right for common stock options.

###### b. All Defendants argue Plaintiff fails to satisfy Rule 9(b) and PSLRA's pleading requirements for statements and omissions made before April 23, 2018, the date of Plaintiff's last open market purchase.

As an initial matter, Defendants do not contest Plaintiff's standing as a buyer or seller for the transactions made between March 2, 2018, and April 23, 2018. Defendants instead contest the sufficiency of the claims. The heightened pleading standard of Rule 9(b) applies to Plaintiff's fraud claims. "[D]irectly put, the who, what, when, and where must be laid out" to sufficiently plead under Rule 9(b). *ABC Arbitrage Plaintiffs Group v. Tchuruk*, 291 F.3d 336, 349 (5th Cir. 2002). Under the PSLRA, "to survive a motion to dismiss, a plaintiff . . . must [] plead specific facts giving rise to a 'strong inference' of scienter." *Nathenson*, 267 F.3d at 407. PSLRA enhanced the Rule 9(b) particularity requirements in two ways. First, plaintiffs must "specify each statement alleged to have been misleading, [and] the reason or reasons why the statement is misleading . . ." 15 U.S.C. § 78u–4(b)(1)(B). Second, for "each act or omission alleged" to be false or misleading, plaintiffs must "state with particularity facts giving rise to a strong inference that the defendant acted with the required state of mind." 15 U.S.C. § 78u–4(b)(2). "A complaint can be long-winded, even prolix, without pleading with particularity. Indeed, such a garrulous style is not an uncommon mask for an absence of detail." *Southland*, 365 F.3d at 362 (quoting *Williams v. WMX Technologies, Inc.*, 112 F.3d 175, 177 (5th Cir. 1997), *cert. denied*, 522 U.S. 966 (1997)).

If a plaintiff does not plead facts giving rise to a "strong inference" of "the required" state of mind, the district court "shall," on defendant's motion, "dismiss the complaint." *Id.* at 409 (citing 15 U.S.C. § 78u–4(b)(3)). The "strong inference" formulation [is] appropriate . . . to ward off allegations of "fraud by hindsight." *Tellabs*, 551 U.S. at 320 (citing *Shields v. Citytrust Bancorp, Inc.*, 25 F.3d 1124, 1129 (1994) (quoting *Denny v. Barber*, 576 F.2d 465, 470 (1978))).

### i. Defendant Stratton argues Plaintiff cannot state a claim against him before he was with the Company, and the Court agrees.

Defendant Stratton joined the Company as Chief Operating Officer on June 4, 2018 and stayed with the Company until October 2020. (Dkt. No. 43 at ¶¶ 17–18; Dkt. No. 44 at 1.) Defendant Stratton did not join the Company until after Plaintiff's final open market purchase on April 23, 2018. (Dkt. No. 43 at ¶ 17.) Plaintiff explicitly excludes Stratton from any allegations of misrepresentations and omission of material facts related to the horizontal program, however, not the vertical program, or undeveloped inventory. (Dkt. No. 43 at 38 n.47.) Regardless of the program, however, there is no action by which Stratton could have induced Plaintiff to make a purchase or sale in connection with the Company's securities before Stratton was with the Company. Plaintiff does not dispute that he does not have a claim against Stratton for anything that occurred before April 23, 2018. (Dkt. No. 54 at 20–22.) As such, the Court finds any § 10(b) claim prior to April 23, 2018, insufficiently plead as to Defendant Stratton.

### ii. Defendant Johnson argues Plaintiff does not plead with particularity that Johnson made any false or misleading statements, and any alleged omission cannot support a viable claim, and the Court agrees.

Defendant C. Bradley Johnson joined the Company as its Director of Reservoir Engineering, in February 2011 he was promoted to Vice President of Reservoir Engineering & Development, and in April 2014 to Senior Vice President of Operations. (Dkt. No. 43 at ¶ 16.) In March 2018, he became the Company's CEO until he was released by the Company on or about

October 20, 2020. (*Id.*) Defendant Johnson argues the claims under § 10(b) and Rule 10b–5 fail

for three reasons. (Dkt. No. 44 at 8.) First, Plaintiff does not plead with particularity that Johnson

made any false or misleading statements and any alleged omission is not actionable. (*Id.*) Second,

Plaintiff's claims for actions after April 23, 2018, are foreclosed by the holder doctrine.[12] (*Id.*)

Third, Plaintiff does not plead facts with enough particularity that they create a strong inference of

scienter. (*Id.*)

Plaintiff identifies three statements made before April 23, 2018, which are properly before

the Court: (1) the 4Q2017 Earnings Call; (2) the March 2018 Press Release; and (3) the April 2018

Press Release. (Dkt. No. 48 at 15.) Defendant Johnson argues at this stage of the proceeding, that

Plaintiff's failure to counter his arguments means he has abandoned his position regarding these

statements. (Dkt. No. 55 at 5–6.)

**Alleged False or Misleading Statements**

First, Plaintiff alleges on November 7, 2017, Defendant Johnson misled him about the area

surrounding the horizontal test wells on the 2017 third quarter earnings call. (Dkt. No. 43 at ¶ 97.)

Plaintiff acknowledges, "[p]reliminary results" were released regarding the first Monster Well as

part of the regularly scheduled earnings call. (*Id.* at ¶ 98.) Plaintiff contends Johnson's disclosure

about the area surrounding the first and third drilled Monster Wells intentionally misled him about

the second well, the Mesaverde Well. (*Id.* at ¶ 96–97.) When Johnson described the Mesaverde

Well he indicated,

---

[12] Defendant's Johnson and Stratton note that there are 21 other statements Plaintiff alleges in Table 1 in the first amended complaint, however those statements are not addressed because they were made after Plaintiff's final open market purchase. As explained above, Plaintiff does not have standing for those statements because of the holder doctrine. The Court agrees with Defendant Johnson and will not consider any statements past Plaintiff's last open market purchase as addressed *supra* in Section III. A. a.

> Concurrent to the flow back of this well we're drilling an intermediate section of our second horizontal well for this year's program the [M-lH] this well is planned for a two mile [lateral] in the Mesaverde formation. This lateral will be stacked directly below the AlH [the first Monster Well] 2500 feet deeper. This well will take a little longer and probably cost a bit more, but it is targeting some of the most prolific sands that we typically encounter with vertical development in this area.

(Dkt. No. 43 at ¶ 97.) (All emphasis by Plaintiff omitted.)

This statement led Plaintiff to believe there was significant vertical development in the area. Plaintiff contends the "Defendants knew that there was no such significant vertical development in the area where the two Monster Wells were drilled" and this was a fraudulent disclosure about the well that misled Plaintiff to "believe there had been drilling in the area of the two Monster Wells." (*Id.*) Plaintiff asserts Johnson confirmed there had been no significant development at a later December 9, 2018, meeting which evidences the misleading disclsoure. (*Id.*)

Johnson explains the statement describes the Company's historical drilling depth in the area. (Dkt. No. 44 at 9.) Johnson argues there is no basis for Plaintiff to have understood the area that was being discussed as exclusively the Warbonnet 9-23 pad. (*Id.* at 10.) Johnson notes that Plaintiff's complaint contains no statements that Johnson ever contextually defined or limited the area to the Warbonnet 9-23 pad, thus there was no statement in which Plaintiff could rely, or form that basis of opinion. (*Id.* at 10.) Similarly, Johnson noted that the alleged November confirmation that "there was no significant vertical development" does not mean there was not any vertical development. (*Id.*)

The Court agrees that Johnson referring to what "[they] typically encounter with vertical development in this area" does not state that there was significant vertical development in the area. (Dkt. No. 43 at ¶ 97.) There is no statement alleged that delimits the area to exclusively the Warbonnet 9-23 pad, but moreover, there is no explanation why Plaintiff assumed this

characterization as being a limited area. Plaintiff fails to specify facts which make this statement misleading, or facts that support his conclusion that the vertical development in the area was significant, or facts that show the "area" Johnson was referring to was something other than the general area. The statement is general, and the alleged November confirmation that there was no significant vertical development, is equally general. Plaintiff has not plead how a discussion of the quality of sand typically experienced in the vertical program could have been misleading about the quantity of vertical development in the area. Johnson explaining what the company "typically experienced" in the vertical program does not easily extend to Plaintiff's assumption that Johnson meant there was significant drilling in the area. The two statements do not equal each other as one discusses historical quality and the other discusses quantity.

Second, Plaintiff alleges on February 28, 2018, the Company released misleading guidance in a press release, investor presentation, and the 2017 fourth quarter earnings call, and intentionally withheld material information on the poor performing wells. (Dkt. No. 43 at ¶¶ 98–100; Dkt. No. 54 at 44–45.) Plaintiff acknowledges, "[t]he preliminary results of the second Monster Well" was announced as a part of the regularly scheduled earnings call. (*Id.* at ¶ 98.) Plaintiff explains that Defendant Johnson provided guidance regarding production expectations for the horizontal wells on the call with an accompanying presentation titled New UPL Investor Presentation February 28, 2018. (*Id.* at ¶¶ 51–55, 70–71.) Defendant Johnson explained, "With 4,600 vertical locations that are low risk and resilient to commodity price cycles . . . Ultra has a long runway of drilling locations to focus its investment efforts." (*Id.* at 16 Table 1.)

Johnson notes that Plaintiff does not allege facts that demonstrate this statement is false. (Dkt. No. 44 at 10.) Johnson argues no reasonable investor would interpret "low risk" to mean no risk and "resilient to commodity price cycles" to mean invulnerable to price cycles. (*Id.*) Critically,

Plaintiff does not allege that the Company was not low risk or resilient to price cycles thereby he does not allege these statements are actually false or misleading. (*Id.*) Plaintiff also highlights Johnson's prepared remarks when he explained the Company would:

> [E]mbark on a new course, a course that will be rooted in capital efficiency, visibility to cash flow and the pursuit of higher returns in order to drive shareholder value . . . In this call, we will provide more commentary and present additional information using our new investor presentation. . . . [he commented later on the call] that means a reduction of vertical drilling in Pinedale that gives way to increased horizontal activity. It also . . . means improved communication to investors. . . .

(Dkt. No. 43 at ¶ 70.) (All emphasis by Plaintiff omitted.)

Plaintiff explains this statement is misleading because there was no other update about the horizontal program until August 9, 2018, despite the commitment to do so. Plaintiff further explains Defendant Johnson noted:

> In November, we announced a very significant horizontal well with an IP of 51 million cubic feet equivalents per day, which included an oil rate of 705 barrels of oil. That oil rate alone might qualify this well for sweet spot status and many other oil plays in North America.

(*Id.* at ¶ 123.) (All emphasis by Plaintiff omitted.)

Plaintiff uses this disclosure regarding the first Monster Well as an example to indicate Johnson misled Plaintiff about the nature of the oil content in the horizontal program. (*Id.* at ¶ 123.) This is the only statement identified regarding condensate yields prior to Plaintiff's last open market purchase. Plaintiff fails to explain why this statement was actually misleading or that it was false.

The February statements are non-actionable puffery. They are "of the vague and optimistic type that cannot support a securities fraud action . . . and contain no concrete factual or material misrepresentation." *Lain v. Evans*, 123 F. Supp. 2d 344, 348 (N.D. Tex. 2000) (citation omitted). "General statements about corporate 'progress' are 'too squishy, too untethered to anything

measurable, to communicate anything that a reasonable person would deem to be important to a securities investment decision.'" *In re Anadarko Petroleum Corp. Class Action Litig.*, 957 F. Supp. 2d 806 (S.D. Tex. 2013) (citing *City of Monroe Employees Retirement Sys. v. Bridgestone Corp.,* 399 F.3d 651, 671 (6th Cir. 2005)). The generalized, positive statements about the company's competitive strengths, like "low risk" and "resilient;" the generalized commitment to improved investor communications; and highlighting future prospects of the test well are not actionable because they are not concrete enough to be a material misrepresentation. *See Southland*, 365 F.3d at 372 ("The generalized, positive statements about the company's competitive strengths, experienced management, and future prospects are not actionable because they are immaterial.").

Third, Plaintiff alleges April 19, 2018, Defendant Johnson misleadingly confirmed his confidence in the Company's assets, business plan, and guidance in a Company press release. (Dkt. No. 43 at ¶ 79.) The press release discussed the Company's credit agreement and "an amendment to certain covenant relief." (Dkt. No. 43 at ¶ 57.) Johnson stated:

> I want to be clear that the covenant relief in no way reflects any concern about our assets, the execution of our business plan or the guidance previously provided. Rather, we proactively pursued such relief from our bank group in direct response to shareholders' belief the market may have unwarranted concerns about the Company's current liquidity and the flexibility of our balance sheet.

(*Id.* at ¶ 57.) Plaintiff explains this statement is misleading because "pursuing relief with the bank group was the first step in restructuring and liability management initiatives at the Company" because of the alleged "well data known at the time, it was apparent the horizontal program was a failure." (*Id.* at ¶ 58.) As of April 19, 2018, Plaintiff alleges that "Defendants" would already have known the program was a failure because they had the data on several of the poor performing horizontal wells that had already been drilled and were to come on-line in the coming weeks and

months. (*Id.*) Plaintiff includes a table in the First Amended Complaint to outline the well data which he alleges Defendants would have been known at this time.

Johnson indicates, "Plaintiff does not even allege what Johnson actually said, much less allege facts showing the statement was false." (Dkt. No. 44 at 11.) Conversely, Plaintiff partially reiterates the April 19, 2018, press release where Johnson is quoted. Plaintiff does not explain why the statement is false but does explain why he believes the statement to be misleading.

April 19, 2018, the Company issued a press release titled: Ultra Petroleum Announces First Quarter Production Above Mid-Point of Guidance, Borrowing Base Reaffirmed at $1.4 Billion and Credit Agreement Amendment Stepping Up Leverage Ratio Covenant to 4.5X.

The statement, read fairly in context, differs in its entirety from what Plaintiff's First Amended Complaint quotes. It reads:

> The unanimous approval by our bank group of both the borrowing base and the net leverage covenant amendment underscores their confidence in the quality of our assets and the strength of our business plan. I also want to be clear that the covenant relief we obtained in no way reflects any concern about our assets, the execution of our business plan or the guidance previously provided. Rather, we proactively pursued such relief from our bank group in direct response to shareholders' belief that the market may have unwarranted concerns about the Company's current liquidity and the flexibility of our balance sheet. [13]

Plaintiff suggests that the Company sought covenant relief and needed restructuring and liability management because the horizontal program was a failure. (*Id.* at ¶¶ 57–58.) At the time of this statement, when Plaintiff claims the "Defendants" would have known the horizontal program was a failure, there was data for six wells, three of which were test wells. (*Id.* at Table 2.) Plaintiff claims by Johnson confirming his confidence in the Company's assets, business plan, and

---

[13]     https://www.globenewswire.com/en/news-release/2018/04/19/1482095/0/en/Ultra-Petroleum-Announces-First-Quarter-Production-Above-Mid-Point-of-Guidance-Borrowing-Base-Reaffirmed-at-1-4-Billion-and-Credit-Agreement-Amendment-Stepping-Up-Leverage-Ratio-Co.html.

guidance he made a false and misleading statement because the horizontal program, in Plaintiff's opinion, was a failure. The statement does not reference the horizontal program.

Plaintiff specifically claims "Defendants" would have known the data that showed the program was a failure which is what makes the statement misleading.[14] The Court cannot impute the alleged knowledge of the Defendants as a group to Defendant Johnson. "[G]eneral allegations and conclusory statements, such as stating [defendants] knew . . . adverse material" is not sufficient for pleading scienter. *Indiana Elec. Workers*', 537 F.3d at 539. Plaintiff's general conclusion that the program was a failure cannot be attributed to Johnson without more. Fairly read in context, this statement does not show that he thought any program or asset was a failure. If anything, it is more reflective of Johnson's thoughts on the bank's opinion. Plaintiff does not plead facts that show Johnson too believed the horizontal program was a failure at the time of making the statement.

Plaintiff does not plead specific facts which show Johnson was severely reckless in not knowing the program was a failure nor how he would have known the program was a failure except citing raw data. The data Plaintiff quotes as proving the program was a failure does not demonstrate any conclusion Johnson had at the time the statement was made such that it shows with particularity that he knew his statement to be false or misleading. In fact, Plaintiff does not allege facts which show the statement to be conclusively false when it was issued because the data he alleges Defendants would have had does not prove the horizontal program was objectively a

---

[14] Plaintiff attempts to impute Stratton's knowledge to the other Defendants, specifically Johnson. But Ultra, the Ultra technical team, are discussed generally, and there is no mention that any defendant would have known anything specifically or how Stratton would have known what the Defendants knew at that time of making statements. The highlighted bankruptcy testimony does not raise a strong inference of scienter because it does not explain the "who, what, when, and where" as necessary to overcome group pleading. *ABC Arbitrage Plaintiffs*, 291 F.3d at 349. (*See* Dkt. No. 43 at ¶ 92–95, n.50.)

failure. Plaintiff does not show the conclusions "Defendants" or Johnson made from the figures, nor that Johnson had seen the figures at the time of making the statement. There are no facts which show that Johnson made this statement with actual knowledge of its falsity or was severely reckless in not knowing its falsity. Accordingly, this allegation is not supported by sufficient particular facts to give rise to scienter.

Even if the Court did not find error with Plaintiff's pleadings regarding the alleged strong inference of scienter taken collectively, based on Plaintiff's response to Defendant's motion to dismiss, Plaintiff has waived any further defense of these allegations. Instead of responding to Johnson's motion to dismiss in regard to the three statements, Plaintiff simply asserts the First Amended Complaint is "replete with well-plead allegations of misleading statements and/or omissions of material facts." (Dkt. 54 at 20–21.) In one paragraph, Plaintiff addresses all three alleged misstatements and indicates that Defendant Johnson "misrepresents the content" of the three misstatements. (*Id.* at 22.)

This is problematic because Plaintiff does not provide any explanation how the statements are misrepresented; does not address why "changing the words 'this area' to 'the area' changes the meaning of a quotation or why that is critical to his argument for surviving the 12(b)(6) motion; and does not explain why or how Defendant Johnson's arguments and application of the law are "frivolous." (*Id.*)

"The Fifth Circuit has held that a claim or defense may be abandoned (or waived) when a party fails to pursue it beyond their initial pleading." *Williams v. Petroleum*, No. CV 18-1012-JWD-SDJ, 2021 WL 649786, at *5 (M.D. La. Feb. 3, 2021), *report and recommendation adopted*, No. 2021 WL 641543 (M.D. La. Feb. 18, 2021) (citing *Black v. N. Panola Sch. Dist.*, 461 F.3d

584, 588 n.1 (5th Cir. 2006) (concluding Plaintiff abandoned claim when she failed to defend her allegation in response to motion to dismiss).

Likewise, courts have found a claim or defense abandoned when the plaintiff failed to defend it in a dispositive motion. *See e.g.*, *Vela v. City of Houston*, 276 F.3d 659, 679 (5th Cir. 2001) (dismissing limitations defense due to abandonment in subsequently filed documents); *Hargrave v. Fibreboard Corp.*, 710 F.2d 1154, 1164 (5th Cir. 1983) (dismissing two claims as abandoned due to plaintiff failing to mention any facts in response to defendant's motion for summary judgement); *Ray v. Dufresne Spencer Grp., LLC*, 2019 WL 97029, at *13 (N.D. Miss. Jan. 3, 2019) ("Plaintiff's response to Defendants' motion . . . does not defend her state law claims. . . . Plaintiff failed to pursue [them and] has abandoned or waived them."); *Draper v. Deutsche Bank Nat'l Tr. Co. as Tr. for Saxon Asset Sec. Tr. 2007-3, Mortg. Loan Asset Backed Certificates, Series 2007-3*, No. 3:18-CV-02904-L, 2019 WL 13240973, at *7 (N.D. Tex. Sept. 30, 2019) (dismissing claims because plaintiff presented no argument in defense of claims in response to the Defendants' motion to dismiss, "the court concludes that she has abandoned this claim").

While the Court recognizes Plaintiff is *pro se*, he does not attempt to defend his allegations regarding the three statements by addressing the merits of Johnson's assertions. There are no direct responses to Defendant's arguments. There are no citations to authority controverting Defendant's arguments. Plaintiff's scoff to Johnson and other Defendants positing an argument is unpersuasive. Pointing the Court back to the Amended Complaint is insufficient to defend his claims regarding these three statements. *See Hargrave v. Fibreboard Corp.*, 710 F.2d 1154, 1164 (5th Cir. 1983) (explaining that a plaintiff, "in his opposition to a motion . . . cannot abandon an issue and then . . . by drawing on the pleadings resurrect the abandoned issue"). Accordingly, the Court finds the

claims regarding the November 7, February 28, and April 19 statements insufficiently plead in the first amended complaint and abandoned in his response to Defendant Johnson's motions.

**Ongoing Alleged Omission**

Plaintiff explains that prior to the February 28th earnings call, during the call, and in subsequent calls "Defendants intentionally omitted disclosing any material facts about the undrilled nature of the area surrounding the Monster Wells." (Dkt. No. 43 at ¶¶ 87–88.) Plaintiff indicates on the February 28th earnings call Johnson was given multiple opportunities to describe the uniqueness of the Warbonnet 9-23 drill pad through prepared remarks and in response to questions. (*Id.* at ¶ 55.) Plaintiff contends "Defendants" failed to describe the area's uniqueness, the uniqueness being that the test area had not been drilled previously. (*Id.* at ¶ 87.) Specifically, Plaintiff alleges:

> [W]hile Defendants had multiple opportunities to disclose that the Monster Wells were located in an undrilled area in its press releases, prepared remarks or in response to questions as well as specific inquiries about the very issue by analyst/investors on conference calls on November 7, 2017, November 15, 2017, January 30, 2017, February 28, 2018, March 12, 2018, and/or May 10, 2018, Defendants intentionally omitted disclosing any material facts about the undrilled nature of the area surrounding the Monster Wells.

(*Id.* at ¶ 87.) Plaintiff asserts any reasonable investor, armed with the knowledge the area was undrilled, "would wait for further results from the horizontal program before investing" but he does not explain why a reasonable investor would be under the same assumption about the area. (*Id.*) Plaintiff asserts the undrilled nature of the area materially altered the meaning of the Monster Wells' success relative to the broader horizontal program. (*Id.*) The undrilled nature also materially changed the guidance the Defendants provided regarding the broader horizontal program because the wells would not be typical for the program and would provide limited longitudinal projection information. (*Id.*) Johnson should have disclosed the Monster Wells were located in an undrilled

area because that factor was critical to the successful performance of those wells because the reservoir had not suffered depletion. (*Id.* at ¶ 85.)

Johnson argues the omission that the Company's horizontal test wells were located in an undrilled area is not sufficient to state a claim for an actionable omission. (Dkt. No. 44 at 9.) Johnson indicates the omission cannot be actionable by itself because a failure to disclose is not a false or misleading statement; there must be false or misleading statement surrounding or connected to the omission that affirmatively creates the impression that the state of affairs is materially different from what actually exists. (*Id.* at 9) (citing *Indiana Elec. Workers'*, 537 F.3d at 541–42). Johnson notes that "[d]isclosure is required 'only when necessary to make . . . statements made, in the light of the circumstances under which they were made, not misleading.'" (Dkt. No. 55 at 2) (citing *Matrixx Initiatives*, 563 U.S. at 44).

Johnson argues that Plaintiff's omission claim fails because: he never alleges facts which show Johnson indicated or suggested the test wells were located in an area that had been previously drilled; he fails to allege why the Company would need to disclose that the test wells were located in an area that had not been drilled previously; and he fails to allege a reasonable investor would have been under the impression the test wells were drilled in previously drilled locations. (Dkt. No. 44 at 9.) Plaintiff does not specifically respond to Defendant's assertions but does contend Johnson admitted to the omission of a material fact by admitting the "real reason for the strong performance of the Monster Wells and poor performance of the rest of the program." (Dkt. No. 54 at 21.)

"Section 10(b) is aptly described as a catchall provision, but what it catches must be fraud. When an allegation of fraud is based upon nondisclosure, there can be no fraud absent a duty to speak." *Cent. Bank of Denver*, 511 U.S. at 174. "Silence, absent a duty to disclose, is not

misleading under Rule 10b–5[.]" *Matrixx Initiatives*, 563 U.S. at 45 (quoting *Basic Inc. v. Levinson*, 485 U.S. 224, 239, n. 17 (1988)). "[A] duty to disclose arises only where both the statement made is material, and the omitted fact is material to the statement in that it alters the meaning of the statement." *Indiana Elec. Workers*', 537 F.3d at 541 (citations omitted). An omission is "material if there is a substantial likelihood that its disclosure would have been considered significant by a reasonable investor." *Basic*, 485 U.S. at 224. Yet, "§ 10(b) and Rule 10b–5(b) do not create an affirmative duty to disclose any and all material information." *Id.* at 44. Disclosure is required when necessary "to make . . . statements made, in the light of the circumstances under which they were made, not misleading. 17 CFR § 240.10b–5(b). Generally, a corporation "does not commit securities fraud merely by failing to disclose all nonpublic material information in its possession." *Indiana Elec. Workers'*, 537 F.3d at 541 (citing *Gross v. Summa Four, Inc.*, 93 F.3d 987, 992 (1st Cir. 1996), *superseded by statute on other grounds as recognized in Greebel v. FTP Software, Inc.*, 194 F.3d 185, 197 (1st Cir. 1999).

Plaintiff's claim of incomplete disclosure is actionable only if what Johnson said is misleading. Johnson's duty would arise where both the statement made was material and the omitted fact is material to that statement because it alters the meaning of that statement. *Indiana Elec. Workers'*, 537 F.3d at 541. Plaintiff must show that Johnson had a duty to disclose that the area was not in its natural state and that the omission is material to change the meaning of what Johnson did say.

Plaintiff does not identify the statement Johnson affirmatively made that was material whose meaning was changed by this omission. (Dkt. No. 55 at 2.) Plaintiff has not described why Johnson had an affirmative duty to disclose the state of the rock when discussing the results of the test wells. Plaintiff has failed to plead specific facts which give rise to Johnson's duty to disclose

the omission of the drilled or undrilled nature of the rock because, while the omission may be material, without the first triggering statement, no duty arises. *Kaplan v. Utilicorp United, Inc.*, 9 F.3d 405, 407 (5th Cir.1993) ("Liability under Rule 10b–5 for nondisclosure arises if there is a duty to speak. . . .").

Plaintiff makes a parallel argument that a disclosure regarding the undrilled nature of the test well site would have significantly altered the "total mix" of available information related to the two wells success and the broader horizontal program. *Matrixx Initiatives*, 563 U.S. at 38. Even assuming the omitted information was material, announcing the test well information as it came online neither stated or implied anything about the drilled or undrilled nature of the rock. Johnson's omission of information on the amount of previous vertical drilling activity did not make his announcement on the horizontal test wells untrue or misleading. Looking at the total mix of information, disclosing the undrilled nature of the rock was not necessary to make the statements Johnson made, in light of the circumstances under which they were made, not misleading.

Moreover, Plaintiff's allegations against Johnson do not make sense when reviewing the data Plaintiff uses to support his claim of incomplete disclosure. (Dkt. No. 43 at Table 2.) The first and third test wells were high performers (the Monster Wells), but the second well (Mesaverde) was not. Plaintiff all but ignore these results when discussing that the reservoir in this area had not suffered depletion. These three test wells were drilled in the same area and were disclosed between November 2017 and February 2018. (Dkt. No. 55 at 3.) Even though the results were variable, Plaintiff made his first purchase March 2, 2017. (Dkt. No. 43 at ¶ 77.) Plaintiff had the performance data on all three wells before he made his first purchase, he continued with his purchase even though the results of the test program were mixed.

The second drilled well, the well drilled in the undrilled area, performed less than the fourth drilled well which was drilled outside the test area, in an area which was previously drilled. The performance of the fourth well contradicts the assertion that all strong performing wells were located in the undrilled area and the strong performance was due to lack of depletion. While Plaintiff has dubbed the program an obvious failure after the first three wells, this conclusion does not make sense in light of the performance of the fourth well.

Before the date of Plaintiff's final purchase there were seven drilled wells, five of the wells were disclosed. Of the two wells that were not disclosed, one was in line with the Mesaverde and another was a lower performer than what had been seen before. But again, not all adverse information must be disclosed as soon as it comes to light as long as the publicly disclosed mix of information is not misleading. *See Lormand v. US Unwired, Inc.*, 565 F.3d 228, 248–49 (5th Cir. 2009). This well was the outlier at the time of Plaintiff's final purchase. This information taken together shows variability from the start of Plaintiff's investment which was consistent throughout his final purchase. The variability was consistent in the undrilled and the drilled area and variability was largely disclosed prior to Plaintiff's last purchase. As such, the Court finds Plaintiff has insufficiently plead a § 10b claim against Defendant Johnson.

### iii.    Defendants Lederman and Fir Tree argue Plaintiff cannot state a § 10(b) on being "tied to" allegedly false and misleading statements, and the Court agrees.

On January 30, 2018, Fir Tree, who owned about a 20% minority stake in the Company, entered into a Cooperation Agreement with the Company. (Dkt. No. 43 at ¶ 166.) The Company announced Defendant Even Lederman would become Chairman of the Board on February 28, 2018. (*Id.* at ¶ 66.) He served through at least June 2020. (*Id.* at ¶ 19.) Plaintiff alleges two statements attributable to Defendant Lederman form the basis of his §§ 10(b) and 20 claim.

On January 30, 2018, Defendant Lederman stated he believed the Company was "the most attractive natural gas company in the U.S." (*Id.* at ¶ 49.) Plaintiff seems to claim this was a material misstatement because the horizontal program's success was being touted before all wells were producing. (*Id.*) Defendant Lederman argues this claim fails for two reasons. First, Plaintiff does not plead the statement was untrue when made. (Dkt. No. 46 at 12.) Second, this statement is considered inactionable puffery. *Police & Fire Ret. Sys. of Detroit v. Plains All Am. Pipeline, L.P.*, 777 F. App'x 726, 730 (5th Cir. 2019) ("[G]eneralized, positive statements about the company's competitive strengths, experienced management, and future prospects are not actionable because they are immaterial."). In Plaintiff's response he references Defendant's statement but no longer asserts that it was misleading. (Dkt. No. 54 at 22–23.) He seems to now assert Lederman and Fir Tree, without distinction, are responsible for an actionable omission. (Dkt. No. 54 at 23.) Plaintiff alleges that since the press release did not disclose that the Monster Wells were strong performers due to being drilled in an undeveloped area, "Lederman/Fir Tree's fingerprints are all over the change in strategy" to pivot to the new horizontal program which accounts for the omission. (*Id.*)

On March 12, 2018, Defendant Lederman stated, "We are all laser focused on accelerating the horizontal program that generates best-in-class cash margins, de-levering the balance sheet, opportunistically hedging to provide cash flow visibility, dramatically improving investor communication and transparency and regaining the market's trust by consistently meeting and exceeding expectations." (Dkt. No. 43 at ¶ 72.) Plaintiff claims this was a material misstatement because he did not follow through with the promise of timely and transparent disclosure. (*Id.* at ¶ 72.) Defendant Lederman argues that Plaintiff does not allege this statement was false when made. (Dkt. No. 46 at 13.) Second, this statement is also considered inactionable puffery. (Dkt. No. 46 at 13.) *See In re Franklin Bank Corp. Sec. Litig.*, 782 F. Supp. 2d 364, 381 (S.D. Tex. 2011) ("Vague,

optimistic statements . . . are not actionable. Allegations that amount to little more than corporate 'cheerleading' are puffery[.] [P]rojections of future performance not worded as guarantees [] are not actionable under federal securities law."). In Plaintiff's response he again quotes the statement, but no longer asserts it is misleading. (Dkt. No. 54 at 23.) Now he states the statement "ties [Lederman] to the misleading disclosure and/or material omission." (*Id.*) He does not specify how this ties Lederman or Fir Tree to what omission or to what misleading disclosure except to say as a member of the board he approved press releases beyond February 28, 2018 when he joined the board.[15] (*Id.* at 24.)

While the Court agrees with Lederman that the statements are inactionable puffery, Plaintiff reframes his argument in his response in opposition to Defendant's 12(b)(6) motions. (Dkt. No. 54 at 22–24.) Plaintiff indicates that Lederman and Fir Tree are liable for a § 10b claim because he and the company were "tied to" the allegedly fraudulent public disclosures and as such it is "silly to suggest Lederman and Fir Tree were not primary violators." (*Id.* at 22.) In Plaintiff's pleadings and his response, it seems that all allegations against Lederman and Fir Tree are one and the same, and any action is attributed to both the man and the company. It is improper to "construe allegations contained in [a] Complaint against the 'defendants' as a group as properly imputable to any particular defendant unless the connection between the individual defendant and the allegedly fraudulent statement is specifically pleaded." *Southland*, 365 F.3d at 364–65 (holding PSLRA abolished group-pleading doctrine).[16]

---

[15] Defendant Lederman points out the allegation that the Board, Fir Tree, or he approved press releases or other public disclosures was not pled, thus is not properly before the Court. (Dkt. No. 57 at 4; Dkt. No. 54 at 24, 29, n.39.)

Lederman and Fir Tree are different Defendants. Plaintiff does not allege that Fir Tree made any statements or omissions. Plaintiff cannot attribute any of Lederman's statements that "tie him" to the alleged fraud to Fir Tree. To properly plead a claim against Fir Tree, Plaintiff should have distinguished between the entity and the person and alleged the role of each. *Fin. Acquisition Partners LP v. Blackwell*, 440 F.3d 278, 287 (5th Cir. 2006). As such, the Court finds Plaintiff has insufficiently plead a § 10b claim against Defendant Fir Tree.

Only those who make statements are liable under § 10b. *Janus*, 564 U.S. at 142–43 (giving "narrow dimensions . . . to a [private] right of action Congress did not authorize" to hold only those who made the statement liable under § 10b and Rule 10b-5). "The maker of a statement is the person or entity with ultimate authority over the statement, including its content and whether and how to communicate it. Without control, a person or entity can merely suggest what to say, not 'make' a statement in its own right." *Janus*, 564 U.S. at 131. Plaintiff must show the Defendants had the ability to control the content of the public disclosures as control persons to sufficiently plead liability for a material omission. *See Firefighters' Ret. Sys. v. Citco Grp. Ltd.*, 855 F. App'x 902, 905 (5th Cir. 2021) ("The alleged primary violations in this case are material omissions from the offering memorandum. . . . to establish that the Citco entities were control persons, the pension plans must show that they had the ability to control the content of the offering memorandum.").

Plaintiff has not alleged with specificity that Lederman or Fir Tree had ultimate authority or control over making or disseminating any allegedly misleading statement. Nor has Plaintiff alleged facts that specifically show Lederman or Fir Tree controlled public disclosure content or how to communicate the content. Plaintiff does not allege that either Lederman or Fir Tree had the ability to prevent the public disclosures he considers misleading. Plaintiff does not allege any public disclosure or omission made was drafted, signed, authorized, or reviewed by Lederman or

Fir Tree. *Southland*, 365 F.3d at 364–65 (requiring "specific facts tying a corporate officer to a statement," like "a signature on the document or particular factual allegations explaining the individual's involvement in the formulation of either the entire document, or that specific portion of the document, containing the statement").

Plaintiff has asserted that Lederman and the company were tied to disclosures by approving them as a member of the board. Alleging control as a member of the board is insufficient to state a claim without also adequately alleging Fir Tree or Lederman's involvement in creating the documents. *Blackwell*, 440 F.3d at 287. Implying Fir Tree, as a major shareholder, had appointment power as opposed to proposal power over the majority of the board's nominations does not translate to Fir Tree's established control over the board. *Dartley v. ErgoBilt Inc.*, 2001 WL 313964, at *1 (N.D. Tex. Mar. 29, 2001) ("[S]tatus as a major shareholder . . . does not, without more, create control person liability."). "Lederman/Fir Tree's fingerprints" do not create the factual imprint necessary to specify their involvement as required to establish control.

Plaintiff asserts that Lederman and Fir Tree had influence over the Company's strategy. Yet, significant involvement in preparing and guiding strategy does not implicitly mean influence over public disclosures. Even if Lederman did exert influence over public disclosures, it is insufficient to transform Lederman and Fir Tree into the maker of the alleged fraudulent disclosures. If Lederman's alleged strategy was provided to another person who then made the disclosures based off that strategy "it is not 'necessary or inevitable' that any falsehood will be contained in the statement." *Janus*, 564 U.S. at 144. A person or entity who only suggests the message is not responsible for ultimately making the statement. Even though Plaintiff does not plead with particularity how or what message Lederman and Fir Tree could have suggested this seems to be the crux of Plaintiff's claim.

It seems that in asserting Lederman and Fir Tree are "tied to" the alleged omissions and misstatements, but did not make any themselves, Lederman and Fir Tree are responsible for "an undisclosed act preceding the decision of an independent entity to make a public statement." *Id.* at 145. Plaintiff has not established what this undisclosed act is that ties Lederman or Fir Tree to the misstatement and/or omission. This is insufficient to state a primary violation under § 10b or under Rule 10b-5. As such, the Court finds Plaintiff has insufficiently plead a § 10b claim against Defendant Lederman.

> iv. **Defendants Chopra and Centerview argue Plaintiff cannot state a § 10(b) when he does not allege any specific misleading statement; nor on being "tied to" allegedly false and misleading statements, and the Court agrees.**

Defendant Karn Chopra is an investment banker employed by Centerview. (Dkt. No. 43 at ¶ 21.) Centerview and Chopra were hired February 2018 and focused on the Company's "investor relation strategy[,] investor relations, [and] messaging improvement." (*Id.*) Plaintiff alleges three instances prior to his last open market purchase that could implicate Defendants Chopra and Centerview: 4Q2017 Earnings Call, press release, and investor presentation; the March 2018 Press Release, and the April 2018 Press Release. (*Id.* at ¶¶ 35, 50–55, 87; Dkt. No. 48 at 23.)

Plaintiff asserts a § 10(b) claim against Chopra and Centerview because of an alleged fraudulent communication that occurred December 4, 2019. This allegation is foreclosed by the holder doctrine because he did not purchase or sell any securities in connection with the conversation. *See supra* Section III. A. a.

While Plaintiff does allege Chopra became involved in investor communications after February 2018, Plaintiff does not specifically plead an alleged misrepresentation or omission by Chopra before his last open market purchase. Chopra asserts Plaintiff fails to state a claim against him because Plaintiff has not pled a statement or omission attributable to Chopra before April 23,

2018. Plaintiff's response to Defendant's motion is the general allegation that all Defendants are liable for false, misleading statements and or omissions of material fact. (Dkt. No. 54 at 20–22.) Plaintiff does not defend his claim against Chopra. While it is likely Plaintiff's failure to respond constitutes abandonment, Plaintiff's group pleading is insufficient to support a claim against Chopra. *Southland*, 365 F.3d at 364–65; *Black*, 461 F.3d at 588 n.1 (confirming a failure to defend a claim in a response to a motion to dismiss constitutes abandonment). As such, the Court finds Plaintiff has insufficiently plead a § 10b claim against Defendant Chopra.

Plaintiff does not allege Defendant Centerview participated in the 2017 fourth quarter earnings call that occurred February 28, 2018. This is confirmed in Defendant's 12(b)(6) motion. (Dkt. No. 48 at 16.) In response, Plaintiff reframes his argument to indicate that Centerview is also tied to false, misleading statements and omission of material fact because of its development of investor presentations. (Dkt. No. 54 at 24, 28.) Plaintiff seems to narrow his claim against Centerview, pre-April 23, 2018, to exclusively its involvement in investor presentations.

Plaintiff alleges a slide contained in the investor presentation February 28, 2018, describing planned horizontal wells contained a material omission because it did not include information about the location being undrilled. (*Id.* at 25.) Plaintiff attributes this omission to Centerview because of the retention agreement with the Company. (*Id.* at 28.) Plaintiff cites the agreement that states Centerview will "assist in the development of . . . presentations to the Company's Board of Directors, various creditors and other parties" as evidence of control. (*Id.* at 27.) The retention agreement also states:

> Centerview "(a) will be using and relying on . . . materials, data and other information furnished to Centerview by the Company and other parties, (b) is entitled to assume and rely upon the accuracy and completeness of . . . information so furnished without having independently verified the same, and (c) does not assume any responsibility for the accuracy or completeness of such information"

(Dkt. No. 58 at 18.) Plaintiff concedes that any information Centerview used would have been provided by the Company but alleges that Centerview chose not to disclose "bad information." (Dkt. No. 54 at 28.) Plaintiff asserts that Centerview was the ultimate authority for creating investor presentations because of the agreement, Chopra's confirmation of Centerview's role, and because the presentations did not require board approval. (*Id.* at 28; Dkt. No. 43 at ¶ 71.)

Centerview argues Plaintiff fails to plead control over investor presentations because Centerview cannot meet the definition of a maker of a statement. (Dkt. No. 48 at 23.) *Janus*, 564 U.S. 142 (holding a third-party advisor who drafted allegedly false statements in investor communications for a mutual fund not liable under § 10(b) and Rule 10b–5 because the advisor did not make the mutual fund's statements as the mutual fund had control or the "ultimate authority" over the messaging). Centerview uses its agreement here to convincingly show that it could not have made any statements because all of the information came from the Company itself. The investor presentations denote Ultra Petroleum, have the UP logo, were published by Ultra Petroleum, and ultimately submitted by Ultra Petroleum. (Dkt. 45 at Ex. 7.) *See Lorenzo*, 139 S. Ct. at 1096–99 (explaining "[o]n the facts of *Janus* . . . an investment adviser who had merely 'participat[ed] in the drafting of a false statement' 'made' by another could not be held liable in a private action under subsection (b) of Rule 10b–5").

Plaintiff does not explain how advising on messaging translates into Centerview becoming the ultimate authority on the Company's messaging, especially when the agreement does not state that it was the Centerview's right or responsibility. Plaintiff does not support this allegation with facts that indicate Centerview had individual autonomy and decision-making power of what was and was not included in investor presentations. He does not explain who determined the information was bad or how bad information was determined, and then who directed Centerview

not to include that information, or if Centerview independently picked and chose what information to include in the investor presentations.

Plaintiff's pleadings are insufficient to show that Centerview was a maker of the statements and/or omissions in the investment presentations, had ultimate authority over investor presentations, or what was published in the two press releases. (Dkt. No. 43 at ¶ 73.) As such, the Court finds Plaintiff has insufficiently plead a § 10b claim against Defendant Centerview.

### c. All Defendants argue that Plaintiff fails to properly plead Rule 10b-5(a) & (c) Scheme Liability, the Court agrees.

Those who disseminate false statements with intent to defraud are primarily liable under Rules 10b–5(a) and (c), [and] § 10(b) . . . even if they are secondarily liable under Rule 10b–5(b). *Lorenzo*, 139 S. Ct. at 1096 (holding that an individual who disseminated a false statement, but did not make it, could be liable under the scheme subsections).

> Securities and Exchange Commission Rule 10b–5 makes it unlawful:
> "(a) To employ any device, scheme, or artifice to defraud,
> "(b) To make any untrue statement of a material fact ..., or
> "(c) To engage in any act, practice, or course of business which operates or would operate as a fraud or deceit . . . in connection with the purchase or sale of any security." 17 C.F.R. § 240.10b–5 (2018).

Plaintiff generally alleges "Defendants" participated in an unlawful scheme to deceive him to purchase securities at artificially inflated prices using boilerplate language. (Dkt. No. 43 at ¶¶ 169, 177, 181.) Plaintiff specifically alleges Centerview and Chopra participated in the fraudulent bankruptcy scheme. (*Id.* at ¶ 149.) The Court will not foray into relitigating the Company's bankruptcy plan and restructuring which has been twice affirmed. *Talarico*, 2020 WL 8361996, at *1.[17] Plaintiff's allegations regarding Defendants Centerview, Chopra, Fir Tree, Lederman,

---

[17] The Court will not specifically address claim or issue preclusion as raised by Defendant Centerview.

Johnson, and Stratton's involvement in a fraudulent scheme are impermissibly vague and generalized to state a claim for scheme liability. Plaintiff has not plead the requisite intent for each Defendant individually to match the general allegation. As such, these allegations fail due to impermissible group pleading. *Southland*, 365 F.3d at 364–65.

### d. All Defendants argue Plaintiff fails to satisfy Rule 9(b) and PSLRA's pleading requirements for Scienter, the Court agrees.

Plaintiff argues Defendants acted with the "state of mind intended to deceive, manipulate and/or defraud" generally. (Dkt. No. 43 at ¶ 164.) Group pleading does not meet the heightened pleading standard for scienter. *Owens*, 789 F.3d at 537. Plaintiff's allegations against Defendants as a group are not properly imputable to any particular defendant here. *See id.* (citing *Southland*, 365 F.3d at 365).

Plaintiff argues that scienter can be inferred because Defendants, by virtue of their position with the Company and their responsibilities, had all of the information to know that the horizontal program was a failure.[18] (Dkt. No. 54 at 17.) "A pleading of scienter may not rest on the inference that defendants must have been aware of the misstatement based on their positions within the company." *Nathenson*, 267 F.3d at 424; *Abrams*, 292 F.3d at 432. More specifically, Plaintiff does not identify any allegations in the complaint before April 23, 2018, showing a specific Defendant knew the horizontal program would be unsuccessful, how he knew it would be unsuccessful, or that he thought it was unsuccessful. Plaintiff's allegations regarding non-specific internally held

---

[18] Plaintiff claims Defendants were privy to and participated in the creation, development, and reporting of the Company's financial conditions based on their positions with the company. Accordingly, their position gave them access to the management team, internal reports, and other data about the Company's finances, operations, and sales, and they were aware of the Company's dissemination of information to the investing public. Despite taking this as true, it does not meet the specificity standard of "who, what, when, and where" necessary to overcome group pleading. *ABC Arbitrage Plaintiffs*, 291 F.3d at 349. (Dkt. No. 43 at ¶ 182.)

information are inadequate to plead scienter. "An unsupported general claim about the existence of . . . corporate reports that reveal information contrary to reported accounts is insufficient to survive a motion to dismiss." *Abrams*, 292 F.3d at 432. Plaintiff points to "False Well Cost Information, Misleading Oil Content Statements, False Statements About the Undeveloped Inventory, The Going Concern Qualifier"[19] as the information "Defendants" would have had. (Dkt. No. 54 at 17.) Plaintiff does not plead when, where, or how Defendants would have formed the conclusion the horizontal program was a failure, he does not point to a specific internal or external report where this conclusion would have been established. Plaintiff does not plead facts that show any one Defendant individually knew the program was a failure such that their statements were false and/or misleading, as required under the pleading standards. (*Id.*)

Next, Plaintiff argues the timing of the disclosures allows for an inference of scienter, however again, not as to a particular Defendant. (Dkt. No. 43 at ¶¶ 109, 114, n.65; Dkt. No. 54 at 19.) Yet, "as long as public statements are reasonably consistent with reasonably available data, corporate officials need not present an overly gloomy or cautious picture of the company's current performance." *Abrams*, 292 F.3d at 433. It can just as easily be inferred that the timing of disclosures outside the regularly scheduled transmission was driven by treating test disclosures different because they were tests. Plaintiff does not allege disclosure contrasted with historical trends or patterns in previous test programs or even in the legacy vertical program.

Next, Plaintiff quotes a law firm's <u>10b-5 Guide</u> interpreting *Tellabs* in support of the assertion Defendants "delayed disclosure of the poor performing wells in 2018 in hopes that they could hit more Monster Wells and bring up average performance" to seemingly allege Defendants

---

[19] The Court does not address fraud claims surrounding the "going concern qualifier" because all events attributed occurred after Plaintiff's last purchase of Company stock.

were severely reckless. (Dkt. No. 54 at 19.) Johnson argues, and the other Defendants join, that Plaintiff's new assertion is the antithesis of his allegations taken collectively— that Defendants knew the test wells were drilled in virgin rock, and would skew the resulting numbers, which would then mislead Plaintiff into purchasing more shares of common stock. (Dkt. No. 55 at 10– 11.)

"Severe recklessness is 'limited to those highly unreasonable omissions or misrepresentations that involve not merely simple or even inexcusable negligence, but an extreme departure from the standard of ordinary care, and that present a danger of misleading buyers or sellers which is either known to the defendant or is so obvious that the defendant must have been aware of it.'" *Abrams*, 292 F.3d at 430. Plaintiff quotes *Tellabs*, for a hypothetical where the potential benefits of concealment would exceed the costs because it would insulate investors from the reality of volatility. (Dkt. No. 54 at 19.) This is not what happened here. The disclosed test results were not consistent, they ranged widely. All disclosures during Plaintiff's purchase period showed a range of results which tends to show the program's volatility. The allegation of severe recklessness is insufficiently plead because of group pleading but it is also not supported by Plaintiff's other factual assertions when taken as true.

Plaintiff asserts that scienter can be inferred against Johnson because he had the adequate motive and opportunity because of a unique stock ownership program, which included stock awards for nearly 70% of his compensation from 2016–2018 which he could not sell unless he followed the policy. (Dkt. No. 43 at ¶ 165.) Plaintiff asserts this shows Johnson had a strong incentive to inflate stock prices "with the hopes of being able to monetize or sell" his holdings. (*Id.*)

Defendant Johnson argues his participation in this policy does not show motive or opportunity because Plaintiff does not allege when it was adopted, thus when it applied to Johnson's statements/omissions; Plaintiff's allegation of incentive based motive is universal to all corporate executives; and in light of all opposing inferences, it is more believable that Johnson acted with a desire for the Company to succeed, he made sincere statements about his beliefs of the Company's future, that the results did not meet his expectations, gas prices plummeted, and coupled with the existing debt, the Company was pushed into another bankruptcy. (Dkt. No. 44 at 15.)

Compensation packages tied to company performance are regular course for "the vast majority of corporate executives." *Indiana Elec. Workers'*, 537 F.3d at 544. "Scienter in a particular case may not be footed solely on motives universal to corporate executives." *Id.* Here, Plaintiff does not allege Johnson exercised his ability to sell his holdings, only that he hoped one day he could sell his holdings. This alleged motive to commit fraud to enhance incentive compensation and inflate stock prices is substantially diminished because there are no facts that indicate Johnson profited from the inflated stock value, especially in light of the bankruptcy. While motive and opportunity allegations can enhance the inference of scienter they do not do so here when reviewing all inferences alleged against Johnson. *Id.* at 544; *Flaherty*, 565 F.3d at 213; *Abrams*, 292 F.3d at 434; *Tuchman v. DSC Commc's. Corp.*, 14 F.3d 1061, 1068 (5th Cir. 1994); *Melder v. URCARCO*, 27 F.3d 1097, 1102 (5th Cir. 1994).

In reviewing all facts taken collectively, Plaintiff has failed to raise a strong inference of scienter against Defendants. Plaintiff's pleadings suffer from numerous errors, and insomuch are insufficient in the aggregate, but most clearly do not plead scienter as required under Rule 9(b) and PSLRA. The facts do not collectively support a cogent and compelling inference that any

Defendant acted with the intent to deceive, manipulate, or defraud or acted with severe recklessness prior to Plaintiff's last open market purchase. As such, the Court recommends dismissing the § 10b and Rule 10b-5 claim because Plaintiff has failed to plead actionable misstatements, omissions, and scienter.

### e. All Defendants argue that § 20 Control Person Liability cannot survive Plaintiff's failure to plead a primary violation, the Court agrees.

Plaintiff's § 20 control person claims should be dismissed because Plaintiff's allegations are insufficient to state a primary violation against any Defendant. Plaintiff directs that "[t]he First Amended Complaint is replete with well plead allegations of violations of securities laws" so his § 20 claim should stand. (Dkt. No. 54 at 30.) Plaintiff does not specifically respond to either Johnson or Stratton's contentions that § 20 is not viable in light of the § 10b claim's failure except to state the "primary violation allegations are sufficient to state a claim for relief." (Dkt. No. 54 at 30.) Plaintiff's theory of liability for Lederman and Fir Tree based on a relationship of influence resembles control person liability under § 20 but it is insufficient to assert primary liability as addressed above. Section 20(a) liability requires that the defendant "control[] a[] person liable" under the securities laws. 15 U.S.C. § 78t(a). Even so, Plaintiff's allegations that Lederman and Fir Tree had the power to control Johnson (and Ultra) fail because Plaintiff does not allege facts that show Lederman or Fir Tree actually did control Johnson.

A § 20 claim cannot survive without Plaintiff adequately stating a § 10(b) claim. *In re Franklin*, 782 F. Supp. 2d at 380; *Alaska Elec. Pension Fund v. Flotek Indus., Inc.*, 915 F.3d 975, 986 (5th Cir. 2019). ("Thus, the failure of a plaintiff to state adequately a 10(b) claim for primary securities fraud violations constitutes a failure to state a claim for control person liability under Section 20(a).") Section 20 claims for control-person liability are "secondary only and cannot exist in the absence of a primary violation." *Dawes v. Imperial Sugar Co.*, 975 F. Supp. 2d 666, 711

(S.D. Tex. 2013). Plaintiff has failed to allege Defendants Lederman, Fir Tree, Stratton, and Johnson exercised control over any primary violator prior to his last purchase on the open market. The Court recommends that the § 20 claim be dismissed.

### B. PLAINTIFF'S FIRST AMENDED COMPLAINT FAILS TO STATE A CLAIM AGAINST ANY OF THE DEFENDANTS FOR COMMON LAW FRAUD UNDER TEXAS LAW.

Plaintiff also alleges a claim for common law fraud under Texas law in his amended complaint. The claim is based on the same alleged misrepresentations and/or omissions underlying Plaintiff's federal securities claims. Plaintiff narrows his claim in his response to Defendants 12(b)(6) motions. He asserts all Defendants' arguments regarding the common law claims fail because each Defendant ignores the "well-settled law of fraud by non-disclosure" and they all misapply the holder claim doctrine. (Dkt. No. 54 at 34–35.) Plaintiff only makes specific arguments against Johnson and Stratton. (*Id.* at 36.) While Plaintiff does not specifically argue against Lederman and Fir Tree, he does summarize their arguments to a sentence each. (*Id.*) Finally, Centerview and Chopra are seemingly grouped but he does not defend his common law claims against them, instead opting to argue why claim and issue preclusion should fail. (*Id.*)

All Defendants argue Plaintiff's arguments fail under Rule 9(b). *See Owens*, 789 F.3d at 535 (instructing plaintiffs must state all allegations of fraud with particularity by identifying the "time, place, and contents of the false representations, as well as the identity of the person making the misrepresentation and what that person obtained thereby"). The Court finds the allegations against Defendants Centerview, Chopra, Fir Tree, and Lederman abandoned because Plaintiff has only stated a cognizable defense to Johnson and Stratton. *Trieger v. Ocwen Loan Servicing, LLC*, No. 3:19-CV-00100-L, 2019 WL 3860689 (N.D. Tex. Aug. 15, 2019) (citing *Black*, 461 F.3d at 588 n.1)); *see also Sapuppo v. Allstate Floridian Ins. Co.*, 739 F.3d 678, 681 (11th Cir. 2014)

(citations omitted) (stating that a party ordinarily "abandons a claim when he either makes only passing references to it or raises it in a perfunctory manner without supporting arguments and authority").

Common law fraud under Texas law requires: "(1) a material misrepresentation; (2) that is false; (3) made with knowledge of its falsity or recklessness as to its truth; (4) made with the intention that it should be acted upon by another party; (5) relied upon by the other party, and (6) causing injury." *Flaherty*, 565 F.3d at 212. Common law fraud claims under Texas law are still subject to the pleading standard of Rule 9(b), which requires Plaintiff to adequately plead fraudulent intent by showing Defendants' motive to commit securities fraud or by showing circumstances that indicate Defendants' conscious behavior. *See Lovelace v. Software Spectrum Inc.*, 78 F.3d 1015, 1018 (5th Cir.1996).

Motives which are universal to corporations and their officers are insufficient to establish an inference of fraud under 9(b). *Indiana Elec. Workers'*, 537 F.3d at 544; *Flaherty*, 565 F.3d at 213; *Abrams*, 292 F.3d at 434; *Tuchman*, 14 F.3d at 1068; *Melder*, 27 F.3d at 1102. A more stringent standard is required for demonstrating conscious behavior. *Lovelace*, 78 F.3d at 1018–19 & n.3 ("Under this standard, 'the strength of the circumstantial evidence must be correspondingly greater' than the evidence required under the motive standard.").

A plaintiff must allege facts showing that a defendant had such a duty to disclose under Rule 9(b). *In re Enron Corp.*, 540 F. Supp. 2d at 771. Whether duty exists is "entirely a question of law." *Hoggett v. Brown*, 971 S.W.2d 472, 487 (Tex. App. 1997). A plaintiff must plead facts indicating a duty to disclose and that they justifiably relied on a misrepresentation or nondisclosure when a claim is based on a failure to disclose. "Reliance is ordinarily a question of fact for the fact-finder" and "is not a proper matter for dismissal on the pleadings." *Jones v. Ray*

*Ins. Agency*, 59 S.W.3d 739, 754 (Tex. App.—Corpus Christi 2001, pet. denied). "The question of justifiable reliance depends heavily on the relationship between the parties and their relative sophistication." *In re Enron Corp.*, 540 F. Supp. 2d at 772.

"Fraudulent concealment or non-disclosure is a subcategory of fraud that occurs when a party with a duty to disclose a material fact fails to disclose that fact." *GMAC Com. Mort. Corp. v. East Texas Holdings, Inc.*, 441 F. Supp. 2d 801, 807 (E.D. Tex. 2006) (*citing Schlumberger Tech. Corp. v. Swanson*, 959 S.W. 2d 171, 181 (Tex. 1997)). To establish fraud by non-disclosure, the plaintiff must show:

> (1) the defendant deliberately failed to disclose material facts; (2) the defendant had a duty to disclose such facts to the plaintiff; (3) the plaintiff was ignorant of the facts and did not have an equal opportunity to discover them; (4) the defendant intended the plaintiff to act or refrain from acting based on the nondisclosure; and (5) the plaintiff relied on the non-disclosure, which resulted in injury.

*Bombardier Aerospace Corp. v. SPEP Aircraft Holdings, LLC*, 572 S.W.3d 213, 219–20 (Tex. 2019) (citing *See Bradford v. Vento*, 48 S.W.3d 749, 754–56 (Tex. 2001) (explaining that there must be a duty to disclose but a general duty to disclose facts in a commercial setting has not been adopted)).

There are four instances an affirmative duty to disclose may arise: "(1) where there is a fiduciary or confidential relationship between the parties;[20] (2) where a person voluntarily discloses information, he must disclose the whole truth; (3) when a person makes a representation

---

[20] There are two types of fiduciary relationships. There is a formal fiduciary relationship that arises as a matter of law, such as principal/agent and informal fiduciary relationships, called "confidential relationships," that can arise "where one person trusts in and relies upon another" in personal, moral, or domestic relationships. *Hallmark v. Port/Cooper-T. Smith Stevedoring Co.*, 907 S.W.2d 586, 592 (Tex. App. 1995). A "director's fiduciary duty runs only to the corporation, not to individual shareholders or even to a majority of the shareholders." *Hoggett*, 971 S.W.2d at 488 (citing *Gearhart Indus., Inc. v. Smith Int'l Inc.*, 741 F.2d 707, 721 (5th Cir. 1984)).

and new information makes that earlier misrepresentation misleading or untrue; and (4) when a person makes a partial disclosure and conveys a false impression." *In re Enron Corp.*, 540 F. Supp. 2d at 771 (citing *Hoggett*, 971 S.W.2d at 487). The last three instances are applied to "arm's length" business transactions. *Oyster Optics, LLC v. Infinera Corp.*, No. 2:19-CV-00257, 2020 WL 5800923, at *6 (E.D. Tex. Sept. 29, 2020) (citing *Bombardier*, 572 S.W.3d at 219).

"The extent to which a duty to disclose exists absent a fiduciary relationship is unresolved under Texas law and by the Fifth Circuit." *Tornado BUS Co. v. BUS & Coach Am. Corp.*, No. 3:14-CV-3231-M, 2015 WL 11120584 (N.D. Tex. Dec. 15, 2015); *see also Mora v. Koy*, No. CIV.A. H-12-3211, 2013 WL 2289887 (S.D. Tex. May 23, 2013) ("Unfortunately, Texas law is anything but straightforward regarding the extent to which a duty to disclose exists absent a confidential or fiduciary relationship," and "this issue is clearly unresolved by the Fifth Circuit."). While "[s]everal [Texas] courts of appeals have held that a general duty to disclose information may arise in an arm's-length business transaction when a party makes a partial disclosure," or a misleading disclosure in a commercial setting under § 551 of the Restatement (Second) of Torts, the Supreme Court of Texas has never adopted such "a general duty to disclose facts in a commercial setting." *Bradford*, 48 S.W.3d at 755.

Here, Plaintiff does not rest his allegations on either type of fiduciary relationship, in his response to Defendant's motions he indicates his claim can arise outside of such relationship. (Dkt. No. 54 at 36.) Plaintiff seems to base his allegation that all Defendants have a duty to him based on law which is not controlling. (Dkt. No. 54 at 36.) While Texas intermediate courts have indicated a duty can arise, it seems the only application is in arm's-length commercial transactions between two (or more) parties. *See e.g.*, *Bradford*, 48 S.W.3d at 749; *TXI Operations, LP v. Pittsburgy & Midway Coal Mining Co.*, No. CIV.3:04-CV-1146-H, 2004 WL 2088911 (N.D. Tex.

Sept. 8, 2004); *Mora*, 2013 WL 2289887, at *4; *Tornado BUS*, 2015 WL 11120584, *1. "While decisions of intermediate state appellate courts provide guidance, they are not controlling." *United Tchr. Assocs. Ins. Co. v. Union Lab. Life Ins. Co.*, 414 F.3d 558, 565 (5th Cir. 2005) ("[W]e need not decide whether a duty to disclose exists in Texas absent a confidential or fiduciary relationship."). The Supreme Court of Texas has not extended a general commercial duty to disclose, thus it follows the court has not expanded a general commercial duty to disclose in the context of corporate disclosures.

Plaintiff has not adequately plead any direct interactions, nor that a direct type of relationship existed with any of the parties where a duty would arise, prior to his last purchase of Company stock on April 23, 2018. Plaintiff has not plead with particularity facts giving rise to a duty to disclose under Texas common law fraud.

### a. Holder Doctrine for Claims after April 23, 2018

Plaintiff maintains he has sufficiently plead a holder claim for statements and/or omissions made after April 23, 2018, under Texas law. (Dkt. No. 44 at 17–19.) *See Grant Thornton LLP*, 314 S.W.3d at 915 (rejecting the investors' "holder" claims and explaining holder claims are claims not that the investors bought or sold securities based on auditor's reports, but that investors held securities when they otherwise would not have). The Supreme Court of Texas has not confirmed it recognizes holder claims and under what conditions it would consider sustaining a claim. Texas has indicated it does not recognize a holder claim based on "misrepresentations [] in publicly available documents" like most of the allegations past April 23, 2018. *Id.* Further, Texas has not decided "whether a holder claim involving more specific and direct communications is actionable under Texas law[.]" *Grant Thornton LLP*, 314 S.W.3d at 930 (declining to extend a claim where

all information investors received was from "online source[s] available to any member of the public").

It is clear Texas will not recognize a holder claim for the publicly available information Plaintiff alleges is fraudulent. This Court declines to extend a claim beyond recognized law for those interactions Plaintiff claims were not in public documents without specific recognition of the viability of a holder claim under Texas law. *Midwestern Cattle Mktg., L.L.C. v. Legend Bank, N. A.*, 800 F. App'x 239, 250 (5th Cir. 2020) ("[A] federal court exceeds the bounds of its legitimacy in fashioning novel causes of action not yet recognized by the state courts."). As such, Plaintiff has failed to state a claim against all Defendants for Texas common law fraud for transaction prior to and after April 23, 2018. Accordingly, the Court recommends the claim be dismissed.

### C. PLAINTIFF'S FIRST AMENDED COMPLAINT FAILS TO STATE A CLAIM AGAINST JOHNSON, STRATTON, AND LEDERMAN REGARDING BREACH OF FIDUCIARY DUTY.

Plaintiff brings a claim of a breach of fiduciary duty against the former board members of the Company. Plaintiff's basis for the fiduciary relationship is the Defendants' role as officers of the Company. (Dkt. No. 43 at ¶¶ 131, 154, 155, 158, 160, 207.) Plaintiff also seems to bring a claim derivatively on the Company's behalf. (*Id.* at ¶¶ 210–11.) While Plaintiff does not specify under which law he brings his claim, Defendants 12(b)(6) motions address the range in which it could potentially be brought under.[21] Plaintiff alleges a breach of fiduciary duty in failing to

---

[21] "Both federal and Texas choice-of-law rules state that a corporation's internal affairs should be governed by the law of the state of incorporation." *In re Noram Res., Inc.*, No. 08-38222, 2011 WL 5357895, at *6 (Bankr. S.D. Tex. Nov. 7, 2011) (indicating "the [place] of incorporation has an interest superior to that of other states in regulating the directors' conduct of the internal affairs of its own corporations"). The Company was incorporated in Yukon, Canada and its primary place of business was in Texas. (Dkt. No. 55 at 15–17.) Plaintiff has not plead any other law which could be relevant here, but Plaintiff's response cites to Delaware law to support the

disclose the event of default leading up to the 2020 bankruptcy, among other breaches. (*Id.* at ¶¶ 131, 154, 155, 158, 160, 207.) Plaintiff indicates it is too early in the proceedings to determine what law his claim should be brought under; however, the Court disagrees and finds Plaintiff has insufficiently plead a breach of fiduciary duty for any Defendant under 9(b). (*Id.*)

Plaintiff cannot bring a claim derivatively on Ultra's behalf because all potential derivative claims were released in the bankruptcy. *See In re Ultra*, No. 20-32631, Dkt. No. 704 (Bankr. S.D. Tex.). Plaintiff's claim under Texas law fails because a "director's fiduciary duty runs only to the corporation, not to individual shareholders or even to a majority of the shareholders." *Hoggett*, 971 S.W.2d at 488 (citing *Gearhart*, 741 F.2d at 72). Similarly, under Yukon law directors also only owe a fiduciary duty to the corporation, not to shareholders. *BCE Inc. v. 1976 Debentureholders*, 2008 SCC 69, [2008] 3 SCR 560 (Can.) (recognizing that directors had a fiduciary duty to the corporation and while, "[o]ften the interests of shareholders and stakeholders are co-extensive with the interests of the corporation. . . . if they conflict, the directors' duty is clear — it is to the corporation"). Plaintiff has insufficiently plead a fiduciary duty between he and Stratton, Johnson, or Lederman under 9(b), and thus has failed to plead a breach of fiduciary duty.

### D. PLAINTIFF'S FIRST AMENDED COMPLAINT FAILS TO STATE A CLAIM AGAINST CENTERVIEW FOR KNOWING PARTICIPATION OR IN AIDING AND ABETTING A BREACH OF FIDUCIARY DUTY.

As an initial matter, § 10(b) liability does not extend to aiders and abettors. *Central Bank of Denver*, 511 U.S. at 177. There is no private right of action for secondary actors unless he is

---

assertion that Texas recognizes a breach of fiduciary duty when a party can show special injury. *See Thompson v. Hambrick*, 508 S.W.2d 949 (Tex. Civ. App. 1974), *writ refused NRE* (Sept. 24, 1974). This case does not support such proposition, but in any event, Plaintiff does not explain why Delaware law applies here. Plaintiff alleges special injury allows continued standing for breach of fiduciary duty but he does not allege he experienced any other injury than that experienced by any other shareholder to fit his cited definition for special injury to occur. (Dkt. No. 54 at 38.)

also liable for a primary violation. *Stoneridge Inv. Partners, LLC v. Scientific—Atlanta, Inc.*, 552 U.S. 148, 158 (2008). In the Court's best estimation, if Plaintiff bases his claim on Texas law for breach of fiduciary duty against Johnson, Stratton, and Lederman then the knowing participation claim follows under Texas law.[22] Texas does not recognize a claim for aiding and abetting a breach of fiduciary duty. *Midwestern Cattle Mktg.*, 800 F. App'x at 250 ("Texas Supreme Court 'has not expressly decided whether Texas recognizes a cause of action for aiding and abetting[.]'")

Knowing participation cannot be brought as a derivative claim on behalf of Ultra shareholders. *See In re Ultra*, No. 20-32631, Dkt. No. 704. A knowing participation claim brought as an individual requires: "(1) the existence of a fiduciary relationship; (2) that the third party knew of the fiduciary relationship; and (3) that the third party was aware that it was participating in the breach of that fiduciary relationship." *Meadows v. Hartford Life Ins. Co.*, 492 F.3d 634, 639 (5th Cir. 2007) (citing *Cox Tex. Newspapers, L.P. v. Wootten,* 59 S.W.3d 717, 721–22 (Tex. App. 2001)). Plaintiff has not sufficiently plead a direct fiduciary relationship between he and Johnson, Stratton, or Lederman in which he can base a knowing participation claim against Centerview. The Court has not found any other underlying fiduciary relationship Plaintiff can base his claim. Accordingly, the Court recommends the knowing participation claim against Centerview be dismissed.

### E.  PLAINTIFF SHOULD NOT BE GIVEN THE OPPORTUNITY TO AMEND.

Rule 15 of the Federal Rules of Civil Procedure directs courts to "freely give leave [to amend the pleadings] when justice so requires." Fed. R. Civ. P. 15(a)(2). "When a plaintiff's

---

[22] Plaintiff, again, does not direct the Court under what law he brings his claim, indicating the "courts have discussed both theories" for secondary liability. (*See* Dkt. No 54 at 41 n.49.) Plaintiff directs the court that it is a choice of law question between Texas and Colorado. As Defendant Centerview explains there is not a conflict of law because the cause of action is legally indistinct. (*See* Dkt No. 58 at 12 n.9.)

complaint fails to state a claim, the court should generally give the plaintiff at least one chance to amend the complaint under Rule 15(a) before dismissing the action with prejudice." *Ricardo v. Bank of N.Y. Mellon*, No. 16-CV-3238, 2017 WL 3424975, at *2 (S.D. Tex. Aug. 9, 2017) (citing *Great Plains Tr. Co. v. Morgan Stanley Dean Witter & Co.*, 313 F.3d 305, 329 (5th Cir. 2002)). However, it is within the sound discretion of the court to decide whether to grant leave to amend, and courts frequently deny leave when a party fails to submit a proposed pleading or explain how he can cure any defects. *See Goldstein v. MCI WorldCom*, 340 F.3d 238, 254–55 (5th Cir. 2003) (finding the district court did not abuse its discretion in denying leave to amend after dismissing claims under Rule 12(b)(6) because "the plaintiffs did not demonstrate to the court how they would . . . cure the pleading defects raised by the defendants" and did not proffer a proposed amended complaint). If it appears that given an opportunity to amend the pleading, the plaintiff would be able to state a claim upon which relief could be granted, the court should grant leave to amend. *People's Choice Home Loan, Inc. v. Mora,* No. 3:06–CV–1709–G, 2007 WL 708872, *4 (N.D. Tex. Mar. 7, 2007) (*citing Kennard v. Indianapolis Life Ins. Co.,* 420 F. Supp. 2d 601, 608–09 (N.D. Tex. 2006).

Plaintiff has failed to respond to that vast majority of Defendants' motions to dismiss, failed to seek leave to amend his pleadings for a second time, failed to submit a proposed amendment while acknowledging it would not likely change the legal analysis, and failed to explain how he would correct any deficiencies. Despite Plaintiff receiving notice of his pleading deficiencies, the "Amended Complaint [is] 'a "labyrinth"'" which makes 'it highly difficult for the Court to assess' its sufficiency 'under Rule 9(b) and the PSLRA.'" *Southland*, 365 F.3d at 385. Defense counsel addressed the numerous pleading deficiencies in a pre-motion letter and telephone conference, but Plaintiff's only change was to seemingly insert "Defendants caused Ultra" to do a laundry list of

corporate activities he alleges to be fraudulent. *See* Dkt. No. 44 at 28; Dkt. No. 46 at 2, 21; Dkt. No. 47 at 24; Dkt. No. 48 at 30; Dkt. No. 55 at 5 n.5, 17; Dkt. No. 58 at 14.) Plaintiff was aware of the potential deficiencies in his allegations but failed to meaningfully correct them.

It does not appear if given the opportunity to amend again, Plaintiff would be able to state a claim even in light of the May 2020 purchase.[23] (Dkt. No. 54 at 11 n.16.) Plaintiff has alleged "[f]ollowing [a] meeting" with Johnson on December 9, 2019, "it was immediately clear to Plaintiff that Defendants had committed securities fraud." (Dkt. No. 54 at 3–4; Dkt. No. 43 at ¶¶ 35, 129, 133.) Plaintiff's claimed awareness precludes establishing reliance or causation for any purchases made after December 2019, thus it will also fail to state a claim. Even so, adding this purchase would not cure Plaintiff's puzzle pleading. *See Owens*, 789 F.3d at 537 (describing a puzzle pleading as a complaint where a court must "wade through a complaint and pick out properly pleaded segments"). Plaintiff's response to Defendant's 12(b)(6) motions repeatedly directed the Court back to his first amended complaint which illustrates Plaintiff's own belief that he has pled his best case.

While the Court understands a *pro se* Plaintiff's complaint must be construed liberally and leave to amend should be granted freely, further amendment will not assist the Court in determining whether "the pleader is entitled to relief." Fed. R. Civ. P. 8(a)(2). The 90-page complaint and the 50-page response requires a laborious deconstruction and reconstruction of a great web of scattered, vague, redundant, and legally untethered allegations. Plaintiff's history

---

[23] *See Coach, Inc. v. Angela's Boutique*, 2011 WL 2446387, at *2 (S.D. Tex. June 15, 2011) (explaining that, "[i]n considering a 12(b)(6) motion, the court should only consider the factual allegations contained in the original complaint" and that "[n]ew facts submitted in response to a motion to dismiss to defeat the motion are not incorporated into the original pleadings"). For completeness, the Court has included the new allegation from Plaintiff's response to Defendant's 12(b)(6) motion to explain that Plaintiff is correct, that this allegation should not change the Court's legal analysis, and therefore, he should not be given leave to amend.

indicates given another opportunity to amend will not remedy his refusal to properly address deficiencies, despite being notified of them.

Under these circumstances, Plaintiff should not be afforded another opportunity to replead because it does not appear that the deficiencies could be corrected and adding his new claim would be futile. *See, e.g.*, *Goldstein*, 340 F.3d at 254–55; *Tchuruk*, 291 F.3d at 362; *U.S. Ex Rel Doe v. Dow Chemical Co.*, 343 F.3d 325, 331 (5th Cir.2003); *Rosenzweig*, 332 F.3d at 864–65. The Court, therefore, recommends Plaintiff not be given the opportunity to amend his complaint and recommends dismissing all claims with prejudice.[24]

## IV.    CONCLUSION

Based on the foregoing, the Court **RECOMMENDS** Defendants' Motion to Dismiss (Dkt. Nos. 44, 46, 47, & 48) be **GRANTED** and the case be **DISMISSED WITH PREJUDICE**.

The Clerk shall send copies of this Memorandum and Recommendation to the respective parties who have fourteen days from the receipt thereof to file written objections thereto pursuant to Federal Rule of Civil Procedure 72(b) and General Order 2002-13. Failure to file written objections within the time period mentioned shall bar an aggrieved party from attacking the factual findings and legal conclusions on appeal.

The original of any written objections shall be filed with the United States District Clerk electronically. Copies of such objections shall be mailed to opposing parties and to the chambers of the Undersigned, 515 Rusk, Suite 7019, Houston, Texas 77002.

---

[24] *See, e.g.*, *Webb v. Midland Mortg.*, No. 12-CV-5138, 2013 WL 4734001, at *4 n.2 (N.D. Tex. Sept. 3, 2013) (finding that, after plaintiff failed to respond to defendant's motion to dismiss and did not otherwise ask for leave to amend, plaintiff was "unwilling or unable to amend her complaint in a manner that [would] avoid dismissal" making dismissal with prejudice appropriate).

**SIGNED** in Houston, Texas on February 7, 2023.

Sam S. Sheldon
United States Magistrate Judge